MARTIN v. MARTIN.

Opinion delivered February 20, 1911.

1. DESCENT AND DISTRIBUTION—ANCESTRAL ESTATE AND NEW ACQUISITION DISTINGUISHED.—Under Kirby's Digest, § 2645, regulating the descent of land according to whether it is ancestral or a new acquisition, an ancestral estate comes with no other consideration than that of blood, whether by gift or devise from father or mother or from any relative in either line; and all other lands, however acquired, constitute a new acquisition. (Page 98.)

2. SAME—NEW ACQUISITION.—Where an heir surrendered her interest in her deceased father's estate upon consideration of her mother conveying to her an interest in such mother's land, this interest was not an ancestral estate, but a new acquisition. (Page 100.)

3. FAMILY SETTLEMENTS—ENFORCEMENT.—Family settlements are encouraged, and will not be disturbed unless strong reasons exist to warrant interference on the part of a court of equity. (Page 102.)

Appeal from Pulaski Chancery Court; *John E. Martineau,* Chancellor; reversed.

*Ratcliffe, Fletcher & Ratcliffe,* for appellants.

1. The land in controversy came chiefly, if not entirely, by gift from the mother to Mrs. Thompson, and, on the death of the latter and her child, went back to the former as a maternal ancestral estate. 15 Ark. 588; 19 Ark. 401; 52 Atl. 172.

2. Plaintiff is estopped to claim an interest in the property in controversy. The division of the property of both the estates

and the execution of the will was in pursuance of a plan of family settlement, which the parties have acquiesced in and acted upon. 15 Ark. 275; 64 Ark. 19; 91 Am. Dec. 761; 42 *Id.* 447; 84 Ark. 610; 8 Cyc. 504-5.

*J. W. House* and *J. W. House, Jr.,* for appellee.

From the testimony, there can be no question that the property came to Mrs. Thompson as a new acquisition, that is, by purchase, or was received by her in consideration of her interest in the Jared C. Martin estate, and upon the death of Mrs. Mary Martin it descended to the brothers and sisters of Mrs. Thompson.    15 Ark. 555; 31 Ark. 103; 70 Ark. 371.    Even if the conveyance from the mother to Mrs. Thompson be considered as an advancement, it is still a new acquisition.    52 Ark. 55.    In order to constitute a family settlement, the parties interested must all agree to it.    If appellants thought the land in question would revert to Mrs. Mary Martin at the death of Thompson, this was a mistake of law that could add nothing to appellant's case. 1 Wend. (N. Y.) 355; 19 Am. Dec. 508; 12 Wis. 125.

FRAUENTHAL, J.    This was an ejectment suit instituted by Mary D. Martin, the plaintiff below, for the recovery of her interest as a tenant in common of a tract of land situated in Pulaski County.    The plaintiff is a sister of the defendants, and she alleged that she and they were the owners in common of the land, and that they totally denied her right as a cotenant therein.    She asserted title to the land as follows: She alleged that her maternal grandfather, John Douglass, died intestate in January, 1861, seized and possessed of the land, and left surviving him Mrs. Mary Martin, the mother of plaintiff, who inherited the property as his sole heir.    Thereafter in 1861 Mrs. Mary Martin, the mother of plaintiff, conveyed said land for a valuable consideration to her daughter, Elizabeth A. Thompson, who died intestate in 1868, leaving surviving her a husband and one child as her sole heir, who died a few weeks later without issue.    Her husband, Lee L. Thompson, remained in possession of said land as tenant by the curtesy until his death in 1905; and Mrs. Mary Martin, the mother, died in 1877.    It was alleged that the plaintiff and the defendants were the sister and brothers of said Elizabeth A. Thompson, and that the land descended to them as her only heirs.

The defendants, J. C. Martin and H. G. Martin, filed an answer in which they alleged that the conveyance executed by Mrs. Mary Martin to said Elizabeth A. Thompson for the land in controversy was not made for a valuable consideration, but was a gift by the mother to the daughter, and thereby it became an ancestral estate which, upon the death of the daughter Elizabeth A. Thompson, intestate, and of her child without issue, ascended to the mother, Mrs. Mary Martin, who had, by will duly probated, devised said land to them. They also alleged that there had been a family settlement made by the plaintiff and defendants and their other brothers and sisters whereby the property which had been owned by their deceased father and the property which had been owned by their mother was by mutual consent divided between said brothers and sisters, and that by virtue of said family settlement the defendants became the owners of and entitled to the land in controversy. The answer was also made a cross complaint, asking the affirmative relief of quieting the title to the land in controversy in defendants. Upon the motion of the defendants the case was transferred to the chancery court, and upon the trial thereof the chancellor made a finding in favor of the plaintiff, and rendered a decree in her favor for the recovery of an undivided portion of the land and the rents thereof.

The controlling questions involved in this case are: First, was the land when it was acquired by Elizabeth A. Thompson by deed from her mother, Mrs. Mary Martin, an ancestral estate or was it a new acquisition? If it was an ancestral estate, then upon the death of Elizabeth A. Thompson intestate and of her sole child without issue, the land, subject to the curtesy estate, ascended to her mother, and, she having by will devised it to the defendants, they became thereby the owners thereof. If, on the other hand, the land was acquired by Elizabeth A. Thompson as a new acquisition, then the land under our statute of descent and distribution went to her brothers and sisters, upon the death of the mother. Kirby's Digest, § 2645; *McFarlane* v. *Grober*, 70 Ark. 371.

Second. If the land was a new acquisition when acquired by Elizabeth A. Thompson, the question then to be determined is, was there a family settlement made whereby the defendants became the owners of and entitled to the land in controversy? In

order to come to a conclusion as to these matters, it is necessary to consider the history of this family and the mutual relations of its members.

Jared C. Martin, the father of the plaintiff and defendants, died on November 7, 1853, and left surviving him his widow, Mrs. Mary Martin, and seven children, in the order of their ages, as follows: James A. Martin, Elizabeth A. Thompson, William A. Martin, Emma Quindley, Mary D. Martin, who is the plaintiff, and the defendants, J. C. Martin and H. G. Martin. The father, Jared C. Martin, died intestate, leaving a large amount of personal property and two tracts of land: one known as the "Arkansas River" farm, containing 333 acres, and the other known as the "Fourche" place, containing 818 acres. He owed a considerable amount of debts. His widow and eldest son were appointed administrators of his estate, and in their settlement thereof accounted for the disposition of the personal property, leaving the lands unsold and the property of the estate. John Douglass, the father of Mrs. Mary Martin, who was the mother of plaintiff and defendants, died in January, 1861, intestate, leaving two farms which were inherited by Mrs. Mary Martin as his sole heir. One of these farms was known as the "home" place, and contained 315 acres, and the other is the land in controversy, containing now about 273 acres. It appears from the testimony that Mrs. Mary Martin, the mother, was a woman of fine ability and good judgment; and she evinced an equal interest in and affection for all her children. From the testimony of the parties to this suit and from the divisions of the properties that were from time to time made between her children it appears that Mrs. Mary Martin conceived the purpose of dividing the farms that were left by her husband and the farms that were left by her father equally between all her children, except James A. Martin, the eldest. It appears that provision and advancement had been made for this child by the father in his lifetime which was equal to the interest that would come to each of the other children by a division of these lands between them. This intention on the part of the mother to thus divide the lands of these two estates is proved, we think, by numerous acts done by her, by divisions of the lands made by her from time to time, and by the very dealings had between the children at her request, as well as by the

testimony of the plaintiff and defendants to this effect. The defendants alleged this in their pleading, and in their evidence stated that this was her desire. The plaintiff testified that she "knew that it was her mother's purpose to divide her property as well as father's (Jared C. Martin) property among all the children and make it as equitable as possible." In pursuance of that object, she in April, 1861, conveyed to Elizabeth A. Thompson the land in controversy. In the deed it is stated that the consideration for the conveyance was $10,000, and that it was paid; and in a settlement made in the probate court by her and her son as administrators of Jared C. Martin's estate, three days after the execution of said deed, a credit is taken for $10,000, in which it is stated that it was for "amount paid L. L. and E. A. Thompson in full of their share in the estate." It is urged by counsel for plaintiff that Elizabeth A. Thompson thus purchased the land from her mother and paid $10,000 therefor. It is not claimed that this sum was paid in money, but it is claimed that it was paid by her surrender of her interest in her father's estate. On the other hand, it is claimed by counsel for defendants that the estate of Jared C. Martin was scarcely more than solvent, in event the widow had taken her dower therein, and that the credit of $10,000 was taken in the settlement for the purpose of closing up the administration of the estate. They contend that the land was the sole property of Mrs. Mary Martin, and that the amount named in the deed was only nominal. They urge that Elizabeth A. Thompson paid nothing for the land, but that it was a gift to her from her mother. We have carefully examined the testimony; and from the facts and circumstances adduced in evidence we do not think that the contention of either party is correct. Upon the one hand, we do not think that the interest of Elizabeth A. Thompson in the estate of her father was worth $10,000, or that this sum was named in the deed as the true consideration thereof; but this amount was arbitrarily placed in the deed for the purpose of naming it as a credit in the account filed in the probate court by the administrators in order to close up the administration of the estate. As a matter of fact, the administrators were not legally entitled to this credit in their settlement for the reason that all probated claims had not been paid when it was taken or when the administration was closed. Upon the other

hand, we find that the estate of Jared C. Martin was solvent, and that the interest of Elizabeth A. Thompson therein was of considerable value. This interest in the estate of her father she surrendered and sold as a part of the consideration of the deed; and therefore the conveyance was not entirely a gift. We think that the evidence clearly shows that it was the intention of Mrs. Mary Martin at that time to have all the lands of her husband's and of her father's estate divided equally among all her children except the eldest, James A. Martin, and that she steadily adhered to that purpose in the disposition of the property then made and of the remainder which was from time to time subsequently made. To carry out that object, she took into consideration the values of the property coming from both her husband and her father, and conveyed to Elizabeth A. Thompson the land in controversy, in order that she might obtain her equitable portion of all the property of both estates. To effect that object, it was necessary for Elizabeth A. Thompson to surrender her interest in her father's estate, so that it could be divided between the remaining children. The land that came from her husband was not owned by Mrs. Mary Martin, but it was the property of the children, and Elizabeth A. Thompson therefore owned a valuable interest therein. That interest Elizabeth A. Thompson surrendered and sold as a part of the consideration for the conveyance made by her mother to her of the land in controversy; and the value of the interest in her father's estate which she thus sold and surrendered was substantial in comparison with the value of the land she obtained by this deed, and was therefore a substantial part of the consideration for that conveyance. Under these circumstances, did the title to the land come to Elizabeth A. Thompson by deed of gift from her mother or by purchase? In other words, if the land came partly by gift and partly by a valuable consideration that amounted to a consideration portion of the entire consideration, was it ancestral or a new acquisition?

In the case of *Kelly's Heirs* v. *McGuire,* 15 Ark. 555, the construction of our statute of descent and distribution, creating ancestral estates and those by new acquisition, has been definitely determined. In that case it is said: "Land is to be considered as having come from or by or on the part of the father or mother when it comes by gift, devise, or descent, either mediately or im-

mediately, from them or from any person in their respective lines;" that is an ancestral estate. In the same case it is said, relative to a new acquisition, that "it is an estate derived from any source other than descent, devise or gift from father or mother or any relative in the paternal or maternal line. If the son should purchase land from the father or mother for a valuable consideration, it would be a new acquisition, and descend as such." The purpose of the statute creating ancestral estates was to keep such estates in the line of the blood from whence they came, and blood must be the only consideration by which they are acquired, whether by devise or gift. If the estate is obtained by any means other than descent, gift or gratuitous devise, then it is a new acquisition; in order for the estate to be ancestral, it must come from the ancestor and without price; it must come with no consideration other than that of blood. In Walker's American Law (4 ed.) p. 409, it is said: "By ancestral property is meant that realty which came to the intestate from his ancestor in consideration of blood and without a pecuniary equivalent, and which must have come either by descent or devise from a now dead ancestor or by deed of actual gift from a living one. And by nonancestral property is meant all * * * that realty which came to the intestate in any other way, whether by purchase from the ancestor or from a stranger for an equivalent paid or by actual gift from a stranger—so that consideration of blood is out of the question, for this makes the sole distinction." In speaking of this phase of the question relating to ancestral estates and those by new acquisition, the Supreme Court of Ohio in the case of *Brown* v. *Whaley,* 58 Ohio St. 654, says: "How, then, shall it be solved when the considerations are thus mixed? The title came either by deed of gift or by purchase. It could not come by both; and, legally speaking, it could not come partly by deed of gift and partly by purchase. * * * * To make ancestral property—title by deed of gift—there must be no other consideration than that of blood." We conclude that, in order to constitute a gift from a parent to a child an ancestral estate within the meaning of our statute, the conveyance must be made entirely in consideration of blood and without any consideration deemed valuable in law; and if such deed is executed partly for a valuable consideration, the estate acquired is a new acquisition.

When land descends to tenants in common, who then divide same between them by mutual consent, a new estate is not thereby acquired by either of them. The coparceners continue after 'partition in the same privity of estate as before, because it does not make any alteration in the estate which came to them by descent. Such partition by deed will not make in the coparceners an estate by new acquisition. 5 Comyns's Digest, 240; *Conklin* v. *Brown,* 8 Abb. Pr. (N. S.) 345; *Carter* v. *Day,* 59 Ohio St. 96; *Harrison* v. *Ray,* 108 N. C. 215; *Finley* v. *Cathcart,* 149 Ind. 470. But in the case at bar there was no partition or division of lands coming from the same line of title. The lands surrendered and sold by Elizabeth A. Thompson were lands inherited by her from her father and actually owned by her. The lands coming from the mother by this deed were not in the same privity of estate as those inherited from her father. When, therefore, she paid her interest in these lands owned by her in consideration of the land conveyed to her by her mother, she obtained the land thus deeded to her, not by gift, but from a consideration deemed valuable in law. The land which Elizabeth A. Thompson thus acquired from her mother was therefore a new acquisition. But we think that the evidence clearly shows that, in making the conveyance of the land in controversy to Elizabeth A. Thompson in the manner she did, it was the purpose of Mrs. Mary Martin to effect an equitable division between her children of the lands coming from her husband and the lands which she inherited; and that this conveyance to her daughter, Elizabeth A. Thompson, was the first step taken by her looking towards that division. All of her children, including the plaintiff and defendants, understood that this was her purpose, and all of them, relying upon her good judgment, acquiesced therein, and from time to time not only agreed to divisions of the lands of the two estates as suggested by her, but made and accepted conveyances based thereon. In speaking of this intention of her mother to thus secure a division of all these lands between her children, the plaintiff testified: "I knew that was her purpose in deeding to Mrs. Thompson the tract now in controversy." In order to carry out that object, divisions of the lands were made from time to time between the children. In 1867 the "Arkansas River" farm, which came from the father, Jared C. Martin, was divided between three of the children:

William A. Martin, Emma Quindley and Mrs. Mary D. Martin, the plaintiff; that tract contained 333 acres, and each of these children obtained 111 acres thereof. In order to effect that object, a petition was filed in the probate court to obtain an order sanctioning such division. At that time J. C. and H. G. Martin were minors, and the petition was signed by Mary Martin, their mother, and James A. Martin, as their guardians, and also by William A. Martin, Emma Quindley and Mary D. Martin, the plaintiff. At the same time, and as a part of the same transaction of dividing said lands, Mary Martin, the mother, conveyed to J. C. and H. G. Martin the "home" place, which she inherited from her father, and in the above petition it is stated, in effect, that she made that conveyance in lieu of the interest of these two children in the "Arkansas River" farm which came from the father and which was to be divided between the other three children above named. Obtaining sanction from the court, deeds were executed to these three children for their respective parts of this farm which came from the father. To carry out this same purpose of the mother to divide these lands among the children, a division was made in 1874 of the "Fourche" farm, containing 808 acres, which came from the father. Prior to that time Emma Quindley had died, leaving an infant child named Emily, and a husband. It was then agreed to divide this "Fourche" farm between William A. Martin, Emily Quindley and Mary D. Martin, the plaintiff. Prior to that time Elizabeth A. Thompson had died, and her only child had also died without issue, and her husband was in possession of the land in controversy as tenant by the curtesy. At that time the only lands which had belonged to said two estates which then remained undivided were the "Fourche" place, which came from the father, Jared C. Martin, and the land in controversy which had been inherited by the mother, Mary Martin, from her father, and which she had deeded to her daughter Elizabeth A. Thompson. Upon a consideration of the facts and circumstances adduced in evidence in this case and the acts and conduct of the mother and all the children before and after that date, we think it clearly appears that the mother, Mary Martin, understood and believed that the land in controversy, having been given by her to her daughter, Mrs. Thompson, came back to her upon the death of her daughter without lineal

descendants subject to the estate by the curtesy of her husband; and we are also of the opinion that all the children also understood that this land in controversy reverted to the mother for the same reason.

On September 25, 1874, Mrs. Mary Martin, the mother and all the children, except the plaintiff, met at the residence of the defendant J. C. Martin, where the mother then lived, for the purpose of dividing these two remaining tracts of the land which came from these two estates. We think that, according to the clear preponderance of the evidence, J. J. Martin, the husband of the plaintiff, was present at this meeting, and there represented his wife as her agent. The plaintiff testified that in all the transactions that were had relative to these lands her husband represented her as her agent, and her husband was offered as a witness upon the hearing of this case by the plaintiff to testify relative to these transactions because he was her agent; and on that account he was permitted to and did testify fully relative to all these matters; otherwise he was incompetent to testify as a witness in a case in which his wife was a party. In furtherance of her purpose to make division of the said lands between the remaining children, except James A. Martin, the mother, believing that she was the owner of the reversion in the land in controversy, told the defendants, J. C. and H. G. Martin, to convey their interest in the "Fourche" place, (which came from the father) to William A. Martin, Emily Quindley and Mary D. Martin, the plaintiff, and in lieu thereof she would devise to them the land in controversy. We think that, according to the clear preponderance of the evidence, it was stated at said meeting that the mother would devise the land in controversy to defendants in lieu of their interest in the "Fourche" place, and that defendants would convey their interest in the "Fourche" place to said William A. Martin, Emily Quindley and Mary D. Martin, the plaintiff, who would then divide said place between them, and that the husband of plaintiff was present, and as her agent acted for her and acquiesced in this division of said lands. In pursuance of that agreement, defendants executed a deed to said parties for the "Fourche" place, and received no consideration therefor, other than the understanding that their mother would devise to them the land in controversy, and the said parties, including the

plaintiff, accepted the deed so executed by them. It is urged by
plaintiff that the defendants had received their entire interest in
all the lands of both estates when their mother executed to them
the deed for the "home" place in 1867, and that when they exe-
cuted the deed to the "Fourche" place in 1874 they had received
consideration therefor in obtaining the "home" place. There is a
conflict in the testimony of the witnesses on this question, but we
think that the petition that was filed in the probate court in 1867
when defendants obtained the "home" place and the will that was
subsequently executed by the mother, Mary Martin, clearly proves
that the contention of plaintiff as to this question of fact is not
correct. The petition was signed, not only by the mother, but
also by the adult children, including the plaintiff, and therein it
is stated in effect that Mary Martin, the mother, had deeded the
"home" place to defendants in lieu of their interest in the "Arkan-
sas River" place which came from the father, and which was then
divided between said William A. Martin, Emma Quindley and
Mary D. Martin, the plaintiff. But we are also greatly influenced
in our conclusion as to this question of fact by the will which
was executed by the mother. That will was written and exe-
cuted by her on September 26, 1874, the day following the above
meeting when the final division of the lands was made. That
will is as follows:

"September 26, 1874.

"Last Will and Testament of Mary Martin.

"My Will: I want Mary D. Martin, my daughter, to have
my clothing. I want Jared C. Martin and Henry G. Martin to
have the piece of land I gave to my daughter, Elizabeth Allen
Thompson, deceased. When you sell the place, I want you to
pay James Allen Martin five dollars for his part. I want Mary
D. Martin to have five dollars paid to her for her part, and Emily
Quindley to have five dollars for her part. I want William's
children to have the fourth of what the place is worth. I don't
want any disturbance about the place. I have done all in my
power for you all; may the Lord bless you all is my prayer; for
Christ's sake, Amen.

"Mary Martin."

By this will she attempted to devise the land in controversy
which she had deeded to her daughter, Elizabeth A. Thompson.

This shows clearly that she understood that this land reverted to her, and therefore thought that she had a right to dispose of it. By this will she in effect devised all this land in controversy to the defendants, thus sustaining the contention of the defendants that at the meeting of the children and the plaintiff's husband as her agent it was understood and agreed that, in order to make á division of the remaining lands of the two estates, the defendants would convey to the other three children their interest in the "Fourche" place and their mother would devise to them the land in controversy. This was clearly the intention of the mother, as shown by this will. The plaintiff testified that her mother was a woman of fine judgment, and wanted to treat all her children as nearly alike as she could. She was always open with all her children in all the transactions she had with reference to these lands, and seemed equally devoted to all of them. Whenever any division of the lands was had, all the children, or their representatives, were present, and we are convinced from the facts and circumstances of this case that the remaining children, amongst whom was the plaintiff, agreed to the division made of these two remaining tracts of the land of the two estates under which the above three children became entitled to and obtained the "Fourche" place and the defendants became entitled to the land in controversy.

This was in effect a family settlement of the interests of these members of the family in these two remaining tracts of land which came from these two estates of the family. Courts of equity have uniformly upheld and sustained family arrangements in reference to property where no fraud or imposition was practiced. The motive in such cases is to preserve the peace and harmony of families. The consideration of the transaction and the strict legal rights of the parties are not closely scrutinized in such settlements, but equity is anxious to encourage and enforce them. As is said in the case of *Pate* v. *Johnson,* 15 Ark. 275: "Amicable and family settlements are to be encouraged, and when fairly made * * * * * strong reasons must exist to warrant interference on the part of a court of equity." *Turner* v. *Davis,* 41 Ark. 270; *Mooney* v. *Rowland,* 64 Ark. 19; *LaCotts* v. *Quertermous,* 84 Ark. 610; *Smith* v. *Smith,* 36 Ga. 184; *Smith* v. *Tanner,* 32 S. C. 259; *Good Fellows* v. *Campbell,* 17 R. I. 402.

We think that the evidence clearly shows that the plaintiff, represented by her husband, and the defendants and those interested in the lands then undivided, and which came from these two estates, entered into an arrangement by which they settled their respective interests and rights in these lands. By this settlement the defendants were to obtain and be entitled to the land in controversy, and the three remaining children, among whom was the plaintiff, were to obtain and be entitled to the "Fourche" place. This arrangement was then carried out on the part of defendants by the execution of deeds by them to the other children for their interest in the "Fourche" place, which was accepted by them. The plaintiff, having accepted the benefits of that settlement, should perform its corresponding obligation. By that settlement the defendants obtained the land in controversy, and are entitled to have their title thereto quieted, as against the plaintiff.

The decree of the chancery court is reversed, and this cause is remanded with directions to dismiss the plaintiff's complaint and to quiet the title to the land in controversy in the defendants, J. C. Martin and H. G. Martin, as against any claim of plaintiff.