WEBB *v.* CALDWELL.

4-5498                                       128 S. W. 2d 691

Opinion delivered May 22, 1939.

*Glover & Glover,* for appellant.

*J. S. Abercrombie* and *F. L. Smith,* for appellee.

HOLT, J. Appellants bring this appeal from an adverse ruling of the Grant chancery court in a suit filed

by appellees to partition the lands of Robert N. Caldwell, Jr.

Robert N. Caldwell, Sr., was the owner of 160 acres of land in Grant county, Arkansas, in 1880. On November 19, 1890, he gave by warranty deed to his son, Robert, Jr., eighty-five acres of this land, his wife, Celina S. Caldwell, joining him in this deed, conveying her dower and homestead rights. There were only two children born to Mr. and Mrs. Caldwell, Robert, Jr., and daughter, Rosella. Robert Caldwell, Sr., died on March 11, 1891, shortly after execution of the deed to his son. The consideration mentioned in this deed to his son is "that we, Robert N. Caldwell, Sr., and Celina S. Caldwell, his wife, for and in consideration of love and respect I have for Robert N. Caldwell, Jr., my son, do hereby give, grant, bargain and convey unto the said Robert N. Caldwell, Jr., etc." Sometime before the execution of the above deed to his son, Robert N. Caldwell, Sr., had given to his daughter, Rosella, the equivalent in value of the eighty-five acres conveyed, in personal property, amounting to approximately $300. Rosella died on April 1, 1892, without living issue.

Robert Caldwell, Jr., after the death of his father and sister, continued to reside with his mother until her death on December 15, 1906. Robert, Jr., had the eighty-five-acre tract of land, referred to above, assessed in his name, and he paid the taxes thereon after acquiring it by deed up until his death on January 1, 1935. The remaining seventy-five acres of the 160-acre tract were assessed, and the taxes paid, in the name of his mother until her death on December 15, 1906, fifteen years later.

It was the intention of Robert N. Caldwell, Sr., prior to his death to give each of his two children an equal amount of property, and this he attempted to do. Up to this point the facts are practically undisputed.

The appellees are the paternal heirs of Robert N. Caldwell, Sr., and descendants of his five brothers and sisters, all deceased. The appellants are the maternal heirs of Celina S. Caldwell, the mother of Robert N.

Caldwell, Jr., and descendants of her four brothers and sisters, all deceased.

It was the contention of appellees, in the trial below, that Robert N. Caldwell, Jr., when he died on January 1, 1935, owned the 160 acres of land in question by virtue of the deed to eighty-five acres from his father and the remaining seventy-five acres by inheritance upon the death of his father followed by his mother's death in 1906, all of which came to him through his father, and that this 160 acres thus acquired is an ancestral estate from his father and is now the property of appellees, his paternal heirs. They concede that prior to his death, Robert Caldwell, Jr., acquired twenty-two acres of land by purchase, which is a new acquisition. There is no dispute as to this twenty-two acres, it clearly being a new acquisiton.

Appellants, on the other hand, contend here that the 160 acres of land, referred to above, is a new acquisition in the hands of Robert N. Caldwell, Jr., at the time of his death and not an ancestral estate.

The only question, therefore, presented for our determination is whether or not Robert N. Caldwell, Jr., at the time of his death held this 160 acres of land as an ancestral estate or as a new acquisition.

The chancellor found that these lands were ancestral, and that they should go to the appellees as the paternal heirs of Robert N. Caldwell, Jr. Appellants, in order to sustain their contention that the land in question is a new acquisition and not ancestral, contend that the son, Robert N. Caldwell, Jr., entered into an oral contract and agreement with his father and mother to take care of them the remainder of their lives for this 160 acres of land, and that both the father and mother had a joint interest in it. That the mother's interest consisted of the homestead and dower right, which had not been set aside to her, and that by relinquishing this right in the deed it constituted a valuable consideration on her part, and, therefore, when she and her husband passed this property by deed to Robert, Jr., under Robert's agreement to support them, it thereby became a new acquisi-

tion in the hands of Robert, Jr., and likewise the remaining seventy-five acres, by reason of this agreement, makes the entire 160 acres a new acquisition. We cannot agree with appellants in this contention.

Mrs. Fannie Webb testified: "Q. Do you know anything about what agreement was made between. Robert N. Caldwell, Sr., and his wife, with Robert N. Caldwell, Jr., about caring for them during their natural lives? A. Yes, I guess— Q. Tell what you know about it—what your information was that you gathered while you lived there, and what you know about it. A. It was always my understanding that he was to take care of them . . . Q. What was he to get in consideration of that? A. The rest of the land, I think. Q. Then it is your information that after the deed was made to eighty-five acres of land that the remainder of the homestead was given to him to take care of his father and mother during their natural lives? A. Yes . . . Q. You were not present when the trade was made, were you? A. No. Q. Who told you about what was in the trade? A. Robert Caldwell, Jr. Q. I want to ask you again, if you will, my mind isn't clear on this. What was in that trade agreement? What did Robert Caldwell, Jr., tell you was in that contract or trade? A. Well, I did not hear the trade but Robert told me. Q. What did Robert tell you? A. That he was to take care of them and they were to give him the land. They gave Rosella something, and they gave him that, because they gave Rosella something. She did not want the land. She had poor health, and did not expect to live, I reckon. She did not want the land deeded to her, she had rather have the other stuff."

Alvin Webb testified: "Q. State whether or not the eighty-five acres was given to him to equal the contribution given to his daughter? A. Yes. Q. Your understanding was after that, that he gave the homestead to Robert under the agreement that he was to take care of him and his mother during their lives? A. Yes." He also said that he deeded it to him merely, because he was his son, and that he had already given some stuff to

Rosella. Also stated that Robert lived in the house with his parents from the time of his birth until they died; that if Rosella had not died, Robert and Rosella together would have been the owners of the land which he (Robert, Sr.) had at the time of his death. He supposed that both gifts to Robert and Rosella were for love and affection.

Sam Webb testified that they all lived in the same house all the time except the sister, Rosella, lived part of the time in a little house on the same place, and stated that it was the general talk that he gave Rosella personal property, and then deeded to Robert eighty-five acres to equal it, then said that he knew that Caldwell, Sr., wanted Robert to have the remainder of his land for taking care of him. He also said he supposed that the gifts to the daughter and son were for love and affection; that all he knows about it is what was told him by someone else; that his opinion all the way along was, and is now, that if Rosella had lived she and Robert, Jr., would have shared alike in the estate of Robert Caldwell, Sr.

Bill Lindsey testified that Caldwell, Sr., gave Rosella some personal property and deeded some land to Robert, he supposed because he wanted him to have it. Didn't know unless it was to equal the contribution that he had given to the daughter, Rosella. Didn't know except what had been told him with reference to distribution of the remainder of the land. Heard no statements from interested parties.

Bob Lindsey testified that he did not know what disposition was made of the other land, not taken in the deed; said neither Uncle Nute, Robert, or any member of the immediate family told him about that; knew only what people said about it. He said that he waited on Uncle Nute. It was a hard winter and he died in March, 1890 or '91; said none of them told him about any agreement except giving Robert the first land, said "Father gave me eighty acres of land, and Uncle Nute told me he had given Robert some land," because "he wanted to even Robert's with Rosella's."

John Stowers testified that Robert Caldwell, Jr., was twenty-five years old when his father died; that he corresponded with him all the time; he talked to me about financial and family affairs and friends. I know Robert N. Caldwell, Sr., gave to Rosella, his daughter, certain personal property, and he gave to Robert eighty-five acres of land which he considered an equal value, prior to his death. And further: "Q. Do you know whether or not there was any agreement made between R. N. Caldwell, Sr., and Robert Caldwell, Jr., that Robert Caldwell, Jr., was to get the amount that he reserved for his homestead in consideration that Robert Caldwell, Jr., was to take care of him and his wife during the remainder of his days? A. I never heard of such agreement. . . . He inherited it . . . Q. Did Robert ever tell you after his mother's death how he came to be the owner of this property? A. No, he never told me. He just told me he owned the whole place. That it came through his father. Of course, he didn't have any other relations living. Of course, he got it all, because Rosella was dead . . ." Rosella and her husband, Jim Roland, lived there. Uncle Nute was in bad health for three or four years with dropsy. Robert taught school in the summer and winter. That was up until Robert was twenty-five or twenty-six years old.

It is our view on this record that the only consideration for the eighty-five acres which Robert Caldwell, Sr., and his wife conveyed to their son by warranty deed, was that stated in the deed, "love and respect" for their son, and that this conveyance was a gift to equalize a prior gift of personal property of the value of some three hundred dollars to Rosella, the daughter. If there had been any intention in the minds of the parties that a part of the consideration was an agreement on the part of the son to care for his father and mother during their lives, it would have been an easy and simple matter to have so stated as a part of the consideration in the deed.

The difference between an ancestral estate and a new acquisition is clearly set out and determined by this court in *Martin* v. *Martin*, 98 Ark. 93, 135 S. W. 348,

wherein it is said: "In the case of *Kelly's Heirs* v. *McGuire,* 15 Ark. 555, the construction of our statute of descent and distribution, creating ancestral estates and those by new acquisition, has been definitely determined. In that case it is said: 'Land is to be considered as having come from or by or on the part of the father or mother when it comes by gift, devise, or descent, either mediately or immediately, from them or from any person in their respective lines'; that is an ancestral estate. In the same case, it is said, relative to a new acquisition, that 'it is an estate derived from any source other than descent, devise, or gift from father or mother or any relative in the paternal or maternal line. If the son should purchase land from the father or mother for a valuable consideration, it would be a new acquisition, and descend as such.' The purpose of the statute creating ancestral estates was to keep such estates in the line of the blood whence they came, and blood must be the only consideration by which they are acquired, whether by devise or gift. If the estate is obtained by any means other than descent, gift or gratuitous devise, then it is a new acquisition; in order for the estate to be ancestral, it must come from the ancestor and without price; it must come with no consideration other than that of blood. In Walker's American Law (4 ed.) p. 409, it is said: 'By ancestral property is meant that realty which came to the intestate from his ancestor in consideration of blood and without a pecuniary equivalent, and which must have come either by descent or devise from a now dead ancestor or by deed of actual gift from a living one. And by nonancestral property is meant all . . . that realty which came to the intestate in any other way, whether by purchase from the ancestor or from a stranger for an equivalent paid or by actual gift from a stranger—so that consideration of blood is out of the question, for this makes the sole distinction.' In speaking of this phase of the question relating to ancestral estates and those by new acquisition, the Supreme Court of Ohio in the case of *Brown* v. *Whaley,* 58 Ohio St. 654, 49 N. E. 479, 65 Am. St. Rep. 793, says: 'How, then, shall it be

solved when the considerations are thus mixed? The title came either by deed of gift or by purchase. It could not come by both; and, legally speaking, it could not come partly by deed of gift and partly by purchase . . . To make ancestral property . . . title by deed of gift . . . there must be no other consideration than that of blood.' "

In the case of *Chaffin* v. *Crow*, 182 Ark. 621, 32 S. W. 2d 155, (a case similar to the case at bar), where Irene Crow, having survived her father and being his sole living heir, became seized and possessed of the lands of her father by inheritance, and she dying without descendants, this court said: "The descent of the lands is controlled by § 3480, C. & M. Digest (§ 4347 Pope's Dig.), which is as follows: 'In cases where the intestate shall die without descendants, if the estate came by the father, then it shall ascend to the father and his heirs; if by the mother, the estate, or so much thereof as come by the mother, shall ascend to the mother and her heirs . . .' This statute was first considered in the case of *Kelly's Heirs* v. *McGuire, supra,* and the conclusions there reached have been followed by this court in a number of decisions down to and including the case of *Eason* v. *Highly,* 181 Ark. 933, 28 S. W. 2d 1048. In the case of *Kelly's Heirs* v. *McGuire,* supra, the court had under consideration each of the provisions of the statute of descent and distribution, and, after a careful analysis, said: "After carefully considering each of the provisions of the statute, and all together as a whole, we have come to the following conclusions: . . . ' '3rd. That, as to real estate, it was the design of the Legislature, where there were no descendants, to point out the line of succession, and that is to depend on the fact, whether the inheritance is ancestral or new; and, if ancestral, then whether it came from the paternal or maternal line. 4th. If the inheritance was ancestral and come from the father's side, then it will go to the line on the part of the father, whence it came, not in postponement, but in exclusion, of the mothers' line; and so, on the other hand, if it come from the mother's side, then to the line on the part of the mother, whence it came, to the exclusion of the father's line'.

As the conveyances were made to Claude Crow, the title devolved to Irene Crow, his daughter, by inheritance, and as it came from the father, it will go to the line on the part of the father to the exclusion of the maternal kin . . .".

In *McElwee* v. *McElwee,* 142 Ark. 560 219 S. W. 30, this court said: "In order to constitute a gift from a parent to a child an ancestral estate within the meaning of our statute, the conveyance must be entirely in consideration of blood and without any consideration deemed valuable in law; . . ."

As to the seventy-five acres, as to which no record disposition appears on the part of the mother and father of Robert Caldwell, Jr., during their lifetimes, we think it clear from this record that these lands came to Robert, Jr., by inheritance only from his father and that he paid no consideration whatever therefor. We think there is no substantial evidence reflected in this record showing any oral agreement on the part of Robert, Jr., to care for his father and mother during their lives, as a consideration for this seventy-five acre tract, and, we, therefore, hold that it is ancestral and not a new acquisition.

There is no evidence in this record to indicate that the land in question was the joint property of the father and mother of Robert Caldwell, Jr. The most that is shown is that the mother's interest was her dower and homestead rights. See *Chaffin* v. *Crow, supra.*

On the whole case we conclude that the findings of the Chancellor are not against a preponderance of the evidence and finding no errors the judgment is accordingly affirmed.