GARDNER *v.* WILLSON.

4-9646

244 S. W. 2d 945

Opinion delivered January 7, 1952.

Rehearing denied February 4, 1952.

788

■■■■■■■■■■■■■■■■  ■■■■

■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■  ■■■■

*Alonzo D. Camp,* for appellant.

*Arnold Adams,* for appellee.

GRIFFIN SMITH, Chief Justice.    Bertrand William Willson died intestate and without issue October 17, 1950, survived by his widow, a brother and sister, and his mother, Janie Willson Gardner. The brother, H. B. Willson, was appointed administrator October 18th. The litigation resulting in this appeal began with a complaint by H. B. and his sister, Florine Willson, asking specific performance of a contract executed November 14, 1950, by the terms of which the decedent's mother and the brother and sister were to share equally in the estate, subject to the widow's rights.

An examination of the deposit box, rented in the name of Frank F. Simmons at Union National Bank, Little Rock, revealed $5,000 in postal savings certificates, title to realty valued at $500, and prime securities worth $12,100—a total of $17,600.

January 11, 1951, Carl Langston was appointed by the probate court as attorney for the administrator. In the same order the so-called family settlement was approved and disbursements authorized according to its terms. Four days later Mrs. Gardner alleged in probate court that her assent to the agreement had been procured through misrepresentations. The suit for specific performance followed.

Although it is stated in the memorandum agreement of November 14th that it was Bertrand Willson's intent to leave his widow dower "and allowances made by law," a preceding sentence is to the effect that Willson wanted his wife "to have her own money which was in the lockbox."

In 1944 Bertrand wrote from Chicago to his brother, H. B., explaining that he had accumulated considerable money, that his health was poor, and that in the event of his death H. B. was to receive the estate, subject to a moral obligation to care for mother and sister. At that

time Bertrand was being sued for divorce. Shortly after the decree became final he married Beatrice Nowicki and they lived together in Chicago until about a year before the fatal illness occurred in 1950. Bertrand was taken to St. Vincent Hospital and for several days was fed intravenously, and oxygen was supplied through a tube.

On October 16th, H. B. wrote out and caused his dying brother to sign the following: "I do this day sign my safe deposit box No. 104 at the Union National Bank to my brother H. B. Willson. I have talked to him in my right mind and have explained to him just what I want done in case I don't pull through my operation. I have faith and trust in my brother and know that he will carry out my plans. *Frank F. Semmons.*"

It was conceded by H. B. that he guided Bertrand's hand while the latter signed the paper; but it is contended that the assignment was made during the morning and that the sick man did not lapse into a comatose condition until five hours before death the following day. The signature is a mere scrawl and because "Simmons" was spelled with an "e" the bank declined to honor the paper.

As grounds for estoppel H. B. and his sister contend that shortly after the family agreement was completed H. B. drove to his mother's home. He was on bad terms with Gardner, his stepfather, whom he had physically chastised a short time before. For this reason, said H. B., he called his mother to the car to discuss affairs connected with Bertrand's estate. Because his mother was worrying over a shortage of funds, he advanced her $100 from the estate assets. This was evidenced by a check drawn on Union National Bank November 15, 1951, and signed personally "H. B. Willson." On the 24th of the same month a second check was written in Mrs. Gardner's favor, the amount being $64. Mrs. Gardner testified that it was understood at the time the check for $100 was given that H. B. was to get back $25, and that sum was refunded. The administrator undertook to show by stubs that the checks were written against his official

account, but the checks proper are negative in that respect.

When Bertrand was taken to St. Vincent's, H. B. told their mother that her son was in the Veteran's Hospital at Hot Springs. This was admitted on cross-examination, with the explanation that Bertrand did not want to be bothered and that he had formerly made a similar request when in the City Hospital. The witness emphasized his faith in the Lord that "everything would turn out right," and for this reason he did not entertain serious apprehension regarding his brother's recovery. That was the reason he did not try to induce the execution of a will. It appears, however, that Langston was taken to the hospital for the express purpose of writing Bertrand's will. In the memorandum agreement, written by Langston, it is said that the attorney ascertained that Bertrand was not in a condition to so act, hence no further steps along this line were taken.

When H. B. was asked whether Langston, who had been his attorney for twelve or fifteen years, prepared a warranty deed the preceding August reciting that Mrs. Gardner conveyed to H. B. a certain piece of property, the witness replied, "Yes, she signed it." Counsel for the defendant explained to the court that his purpose in introducing this transaction was to show that H. B. exercised controlling influence. Some of the questions and answers that followed were: Question: "After your mother threatened to get a lawyer and see what she had signed, tell the court whether you called upon her . . . and said, "Mamma, that paper you signed was to put my house in your name so my wife can't get it: I am going to get married pretty soon [and] don't want my wife to get my house." A. "My mother knew all about that. She suggested that I do that, and she willingly signed those papers to help me out. Being my mother, she didn't want me to lose my property—she knew all the time."

In respect of the family settlement, H. B. testified that he told his mother that in order "to settle this thing and settle it peacefully—if she wanted to do that with-

out spending all the money for attorneys, [the thing to do would be] to go down and talk to Carl [Langston], and he would explain to her the necessary steps to take to have a peaceful settlement.'' After denying, then admitting, that he talked with Langston before sending his mother to the attorney, there was this colloquy:

Question by counsel for Mrs. Gardner: ''You did talk to Carl Langston about the transaction, and what was to be done?'' The Court: ''The agreement shows Mr. Langston went to the hospital and talked [with Bertrand] before he died. The agreement shows that,— that is true, isn't it, Mr. Willson?'' A. ''Yes, sir.'' The Court: ''He understood the situation?'' A. ''He understood it: when he went out to the hospital and talked to my brother, he knew.'' The Court: ''He knew your brother's desires?'' A. ''Yes.''

The witness was then asked if he explained clearly to his mother what she was signing:—''Did you tell her she was giving away two-thirds of what was hers under the law?'' A. ''I told her exactly how it was, what she was to get after [the widow] was paid: that my brother's will was for it to be equally divided—it was [my brother's] desire.'' Q. ''[Was she] aware of the nature and consequences of her acts in signing the instrument in suit—the same as when she signed the deed?'' A. ''Yes, sir.''

Testifying further as to circumstances attending Bertrand's last illness, H. B. said that he went by his brother's home, found no one, then traced Bertrand and his wife to the hospital where Mrs. Willson had taken the patient. Thereafter he did not see his mother until she came to the hospital. He didn't remember having seen his mother (seemingly) between the time Bertrand was taken from his home until Mrs. Gardner called on her sick son at the hospital. (It is significant that H. B. had not seen his mother, yet he had told her that Bertrand was in the Veterans Hospital at Hot Springs).

The clear inference to be drawn from H. B.'s testimony is that after Langston had determined Bertrand

was not competent to make a will, the paper purporting to assign contents of the lockbox was prepared and executed, although it is difficult to determine from the record the precise time the transaction occurred.

Florene Willson, the sister and one of the appellees who was a plaintiff below, testified that Bertrand, while in the hospital, asked H. B. to take care of "B", (the sick man's wife) because she had been good to him; "and", said she, "the rest of the money he wanted divided: wanted everything carried out peacefully and no lawsuits." The statement was then made by the witness that some time after Bertrand died she met her mother in front of a down-town bank. Mrs. Gardner told her they were going to get equal shares of Bertrand's money, "and when we went to Langston's office Mother and H. B. had signed papers—I was the last one." The agreement, as she understood it, was that "they" were going to get equal shares of the estate, "and that 'B.' was going to be taken care of."

In his testimony Langston conceded that in addition to his personal representation of H. B. Willson, he was attorney for the estate. He thought the family agreement was drawn on a day succeeding a visit from H. B., his mother, and Florene. He was told, inferentially during this first visit, that Bertrand wanted to make a will, but for one reason or another hadn't done so. According to statements by the three, they wanted to "split" the estate three ways after the widow's allowances had been deducted. This, they said, was the dead man's wishes, "So I read to them the statute of descent and distribution and advised [Mrs. Gardner] what her rights were —told her she would be entitled to this estate; that she was giving away money to her children. That brought [on the discussion that Bertrand had tried to give the property] to H. B. through the lockbox: make a gift to him, and they had some papers there his brother had signed which would open the door to litigation. [Mrs. Gardner] said litigation was what she wanted to avoid; . . . she didn't want any more family troubles— wanted a peaceful settlement of this thing."

According to Langston several days elapsed before the agreement was drawn: more than a week, perhaps, and during that time Mrs. Gardner was in the office every day. When the agreement was finally put into written form Langston's secretary had gone home, so his wife, who is a court reporter, took the dictation and Mrs. Gardner from time to time made suggestions. The attorney was sure Mrs. Gardner understood what she was doing. The document was acknowledged before Carl J. Muerer, a notary public with offices near Langston's. Mrs. Gardner explained the agreement to Muerer after Langston had undertaken to do so. Later, said Langston, Mrs. Gardner consulted him regarding a new will she was thinking of making. Muerer testified that Langston told Mrs. Gardner briefly what the document was, and that Mrs. Gardner remarked that the wishes of her dead son were being carried out.

Mrs. Gardner, 67 years of age, testified that she was in poor health with hypertensity of 200, and that she suffered from spasms of glands and muscles, in addition to sciatic nerve troubles and toxemia. Bertrand's death disturbed her greatly. Shortly after the funeral H. B. came to her home and called from the street, asking her to come out to his parked car. He said, "Mamma, we have inherited some money. Carl Langston wants you to come to his office and sign legal papers." She asked him how much money Bertrand had in his lockbox,[1] the reply being that there wasn't time to tell. He then added: "I am giving you $100 now and I am going to give you $2,000. When I do that I want you to give it back to me and let me put it in my lockbox and dish it out to you as you need it—I don't want you to let Paul Gardner know you have inherited anything."

Reëmphasizing this conversation, Mrs. Gardner said H. B. told her he wanted $25 back when she cashed the $100 check. He did not mention the amount of money anticipated from the estate. The principal comment was that he was *giving* her $2,000. The same day she went

---

[1] Mrs. Gardner added, "I told him to get the lockbox and put his money in it." Inferentially "he" identifies Bertrand, as there was no testimony that she had ever discussed the lockbox with H. B.

to Langston's office, told him H. B. had directed that she sign some papers. Langston said, "Now, Mrs. Gardner, you know that your son could not make a will, the courts would not have it this way." The following is quoted from the testimony: "I said [to Langston], 'I know now my two brothers and I had to make my mother's will: she messed it up and we had to make it. . . . That is what I am doing now—making my son's will like I made my mother's', and [Langston] said, 'Yes, that is what you are doing.' So I was under the impression that I was making Bertrand's will."

The witness insisted that she didn't know she was being asked to sign away two-thirds of an estate to which she was entitled by law:—"I didn't know it because I didn't know what Bertrand had." She denied that Langston had explained to her what, under the law of descent and distribution, she would have:—"He didn't tell me anything like that or make any explanation at all."

Mrs. Gardner admitted that she was in probate court when the order of January 11th was made, but she thought she was agreeing "to the will she had signed," and did not, in fact, know what was taking place. She did not become suspicious until after the papers were signed, until Attorney Langston said, "Judge Williams, Mrs. Gardner does not think she is going to live long and she wants to give her children their shares now." Mrs. Gardner said she wondered what their share was, "Because Carl Langston had just made my will and these children were provided for in it."

With this doubt in mind Mrs. Gardner left the court-room and went to see a lawyer. When she undertook, in this suit, to repeat what the lawyer told her, the advice he gave, there was an objection from adverse counsel on the ground that the testimony would be hearsay. By the Court: "Oh, no! But it shows she is familiar with court procedure. She went around to see a circuit judge and other lawyers. It shows she isn't a dumb bell. It shows she knows her way about. Go ahead." The advice so given was then explained by the witness.

On cross-examination Mrs. Gardner admitted that H. B. told her he was giving her the hundred-dollar check out of Bertrand's estate, but she didn't know where money to pay the second check came from. She first stated that Judge Williams read the agreement to her before the order of January 11th was made, then qualified this by saying she didn't remember whether he read it in its entirety. When asked whether the Judge explained the agreement and order to her, Mrs. Gardner replied, ''All I remember is that you read it.'' She denied that Langston explained it in detail, and also denied, in response to Judge Williams' question, that she went into an ante-room with him. However, she did not make a protest when the order was signed. Judge Williams commented: ''I certainly wanted you to understand it and I thought you did. If I hadn't thought you understood it I wouldn't have approved it.'' By Mrs. Gardner: ''I hope God strikes me dead before I get out of this seat that I didn't understand that. You just read the document.''

Paul J. Lochbaum, clerk of the court, testified that he remembered hearing Judge Williams ask Mrs. Gardner if she understood the ''purport'' of the document. Mrs. Gardner didn't understand the term, so the Judge said, ''In other words, do you know what this means?'', and there was an affirmative answer.

*First—The Court's Explanation.*—The evidence is convincingly clear that the document was read to Mrs. Gardner by Judge Williams and that he had reason to assume that she understood; but the fact cannot be denied that the living son whose influence brought about the consummation was wanting in candor and frankness. In undertaking to denude himself of realty just before marriage, a constructive fraud was practiced. *Barnett* v. *Barnett,* 209 Ark. 973, 193 S. W. 2d 319. As urged by appellate counsel, this went to the question of credibility in the trial court, but it is also a matter for our consideration *de novo.*

*Second—The Evidence.*—It is admitted by H. B. that Bertrand, in money affairs if not otherwise, used the

unexplained alias of Simmons; and, while H. B. testified that he told his mother how much money the lockbox contained, the abstract does not reflect that he told her *what* this amount was. This appellee protested consideration for his mother, explaining that he had dinner with her every Sunday; but, in dealing with the fund in question, instinctive self-serving elements of a character countervailing the mother's rights are definitely disclosed unless his own version and the explanations made by Florene regarding Bertrand's wishes are to be accepted at face value. It is noteworthy that the widow did not testify orally or by deposition, nor were interrogatories propounded.

The letter of 1944, would, of course, indicate Bertrand's intent at that time to make H. B. the beneficiary of the estate, but it must be remembered that the writer was later divorced and married another. H. B. testified that Bertrand, during his last illness, mentioned that Mrs. Willson had been attentive—"good to me," were the quoted words. Nor were the purposes expressed in the letter carried out through procurement of a lockbox with two keys, with the agreed right of each to enter and for H. B. to take all in the event of Bertrand's death. The failure to execute the ends discussed in 1944 was presumptively intentional on Bertrand's part.

*Third—Signature of Frank F. Simmons.*—The record in this specific performance suit does not sustain appellees' claim that the note written by H. B., who guided his brother's hand in signing, was the free and voluntary act of a person with disposing mind and memory. Langston's testimony that he went to the hospital for the purpose of having Bertrand execute a will, but thought him incapable of doing so, is highly persuasive of the proposition that when the name "Semmons" was scrawled on H. B.'s prepared paper Bertrand must have had but limited comprehension of what was being done.

It should be noted that the attempted assignment of October 16th does not include any members of Bertrand's family—not even his wife—by any express terms. Every-

thing is left to H. B. with the expression in H. B.'s handwriting that the dying brother has faith in him. Perhaps so; but the policy of the law is to throw every practicable safeguard around those who are not in a position to think clearly. It has been said that if a witness should affirm the testator's insanity, but gives as a basis for such opinion facts which do not justify it, the evidence on this point is worthless. *Puryear* v. *Puryear*, 192 Ark. 692, 94 S. W. 2d 695. Of course the converse is true: the testimony of a witness that one who executed a beneficence in his or her favor was fully rational must be examined in the light of attending facts.

*Fourth—Family Settlement.*—Appellees correctly state the rule to be that family settlements are favored. *Stark* v. *Stark*, 201 Ark. 133, 143 S. W. 2d 875; *Martin* v. *Martin*, 98 Ark. 93, 135 S. W. 348; but equity will grant relief to one yielding to the coercive influence of relatives; and this is invariably true where there is a confidential relationship respecting an inheritance or distributive shares of an estate. *Outlaw* v. *Finney*, 175 Ark. 502, 1 S. W. 2d 38. Appellees cite *Mooney* v. *Rowland*, 64 Ark. 19, 40 S. W. 259, but that case is distinguishable from the litigation at bar by the headnote summation which says: "A parol agreement by an heir relinquishing his share in his ancestor's land in consideration of the release of his indebtedness to the estate and to his co-heirs will be specifically enforced where such agreement has been acquiesced in for 25 years, and valuable improvements have been made upon the strength of it."

Here the only suggested considerations moving to Mrs. Gardner were two checks, one for $100 and another for $64, called "advances from the estate." It is conceded she was entitled to $2,000. It is hard to rationalize that the principles of estoppel should be applied against one receiving an insignificant portion of her own money.

*Fifth—Confused Representation.*—Without undertaking to assay the motives actuating H. B. Willson and his personal attorney, it is sufficient to say that the son lulled his mother into a situation where she was without

the advice of counsel not obligated to other clients whose interests were antagonistic to her, and irrespective of any purpose to promote harmony in the family, information came primarily from H. B. Willson. These were circumstances that did not necessarily come to the attention of the probate court, but they involved complications with results that should not bind appellant.

*Sixth—Conclusions.*—This record does not show who represented the widow, what amount has been paid to her, or how her interests were dispatched. In view of our findings and the lack of any showing regarding probate proceedings other than the orders mentioned and Mrs. Gardner's action to annul the family settlement, we shall assume, with binding force, that neither the chancery nor probate court will permit disbursements responsive to the contract here invalidated.

Reversed, with directions to dismiss the action for specific performance.