STARK *v.* STARK.

4-6056 143 S. W. 2d 875

Opinion delivered October 21, 1940.

*Kenneth Rayner,* for appellant.

*Canale, Glankler, Loch & Little* and *Norton & Butler,* for appellee.

Smith, J. This appeal is from the judgment and decree of the Lee chancery court, sitting in probate, which denied probate to a certain paper writing propounded as the last will and testament of William A. Stark, who had been twice married. To his first marriage, one child only, a son, William P. Stark, was born. On June 20, 1922, prior to his second marriage, W. A. Stark executed a will, which was duly attested, under which he gave his entire estate to his son, William P.

Stark was married the second time in 1925, and was living with this wife at the time of his death, but no child had been born to that union. On the day of his death, Stark took his wife to a community gathering, but having, as he supposed, an attack of indigestion, he returned home without his wife. Upon her return home she found Mr. Stark dead. A servant at the house was unaware of Mr. Stark's death until his dead body had been found. The son was notified of his father's death, and attended the funeral. After the funeral the widow and son went through a safe deposit box which Mr. Stark had in a Memphis bank. Valuable papers were found,

but no will. A small iron safe was kept in a room in the Stark home, in which there was also a roll-top desk. No will was found in the iron safe, but a paper writing was found in the desk, which is the paper writing filed for probate. This writing consisted of a single sheet. One side of this sheet was captioned: ''Will of William A. Stark,'' and there followed this caption a will duly attested by witnesses, which was evidently written by a scrivener experienced in such matters. After the attestation clause there was written in the admitted handwriting of Mr. Stark the following sentence: ''William Give Don my watch & charm. Keep my Masonic ring. Your Mother's Science pin is in Grandma Stark possession Loaned only. (Signed) Dad.'' Across the body of the will there was written in Stark's handwriting the words: ''Canceled Apr. 1 1930. (Signed) Wm. A. Stark,'' and through the attestation clause there was written in Stark's handwriting the word: ''Canceled.'' The signature to this will had been cut away. A segment of this page, something more than an inch in width and about five inches long, had been cut away. The cut was smooth, indicating that it had been made with a sharp instrument, possibly a knife or scissors. On the reverse side of this page there appears in Stark's handwriting the following writing:

''Apr. 1, 1930

''At this time I have *no Will* believing My Wife— Will of my personal Estate give my Son such as he may choose of the same—there is barely sufficient to maintain her with no other beneficiary. Should my son Wm. P. Stark meet with reverses I feel the relation between Hazel and him are such as would justify each others Confidence.

''(Signed) Wm. A. Stark.''

This writing was evidently done after the will had been mutilated, as is evidenced by the fact that the writing quoted is above, below and opposite the segment which had been removed.

The widow and son, the parties to this litigation, took the paper writing to an attorney who had attended

to Mr. Stark's legal business, and the attorney expressed the opinion that the writing was not a will, and could not be probated as such. After further conference between the parties and the attorney, it was agreed that Stark's estate should be divided as in case of intestacy. An agreement to that effect was prepared under date of September 15, 1933, which recited that "William A. Stark, the father of William P. Stark, and the late husband of Hazel A. Stark, departed this life intestate in Lee county, Arkansas, on the 22nd day of June, 1933."

We have the impression, from reading the contract of settlement of the estate, that the widow was given something more than the law would have allowed her; but she makes no complaint that she was not given her full share if she is required to take under the statute, and not under the will. This contract of settlement provided that out of cash on hand the widow should pay all debts of the intestate, which were not large. The son and his wife executed and acknowledged the agreement at their home in Kansas City on September 15, 1933, and the widow signed and acknowledged it at her home in Lee county on September 23, 1933.

Division of the estate was made in accordance with the agreement, and no question was raised about it until 1939, at which time the son's wife filed a foreclosure suit against the widow growing out of another entirely different transaction. The widow employed an attorney to represent her in the foreclosure proceeding, to whom she exhibited the alleged will, and was advised by the attorney to file the will for probate. This was attempted, but the court found that "Said purported writing does not constitute a last will and testament," and from that judgment and decree is this appeal.

The writing begins with the statement that "At this time I have *no Will.*" Had Mr. Stark intended to make one, he had, on the reverse side of the page, a concise, well written will, which he need only to have copied. He had never told his wife that he had made a will, although the paper had been in existence for more than three years, and the wife knew nothing of its existence

until it was found in the roll-top desk. This was not the place where Mr. Stark kept his other valuable papers.

Mr. Stark's shoes were found on top of the roll-top desk, and it is argued that this was a significant circumstance, and that the shoes were probably placed there to suggest to his wife that she search the desk. We think, however, that this circumstance cannot supply proof of an intention not expressed in writing. There is nothing to indicate that Mr. Stark thought, on the day of his death, that he was about to die. He left the community gathering, to which he had escorted his wife. Mr. Stark thought he had an attack of indigestion, and went home for that reason. But not enough importance was attached to the illness to suggest to Mrs. Stark that she should return with her husband to their home. We do not know, and the testimony does not show, who placed the shoes on the desk, nor when and why this was done. This circumstance cannot, therefore, be given any controlling effect, and the writing must be construed in accordance with the terms thereof.

The cases chiefly relied upon to sustain the contention that the writing was a will, and should be so construed, are *Arendt* v. *Arendt*, 80 Ark. 204, 96 S. W. 982, and *Cartwright* v. *Cartwright*, 158 Ark. 278, 250 S. W. 11.

In the case first cited, a letter from the husband to his wife was construed to be a will. This letter was written in contemplation of death and on the day the husband committed suicide. The letter stated: "Whatever I have in worldly goods, it is my wish that you should possess them." In holding this letter was a will Judge RIDDICK quoted from 1 Jarman on Wills (6 Ed.), 21, statements of law to the effect that it was not essential to the validity of a will that it should assume any particular form or be couched in language technically appropriate to its testamentary character, but that the writing, however irregular in form, was sufficient if it disclosed the intention of the writer respecting the posthumous destination of his property, and that if this appear to be the nature of its contents,

any contrary title or designation which may have been given to it would be disregarded.

The Cartwright case, *supra,* is to the same effect. In that case, as in the Arendt case, a letter from the husband to his wife was admitted to probate as a will. It was said by Chief Justice McCulloch in the Cartwright case that "The question whether or not an offered instrument is testamentary in form or substance so as to be admitted to probate is one of law for the court to determine from the face of the offered instrument." But this and all other cases are to the effect that there is no will unless there exists the "*animus testandi,*" which phrase is defined as the intention to make a will, and the existence of this intention is not a matter of inference, but must be expressed so that no mistake be made as to the existence of that intention.

Here, the purported will made no reference, directly or indirectly, to the real estate which Stark owned, although he owned a farm of 368 acres (238 acres of which were assigned to the widow as dower). There is nothing to indicate that if Stark had intended this second writing to be a will, as was the one on the reverse side of the page, why he did not dispose of all his property.

We conclude, therefore, that the court was not in error in holding that the writing did not constitute a will.

We are of the opinion also that as only the widow and son are concerned in the distribution of this estate (both of whom are *sui juris*) they had the right to make an agreement for the division of the estate, which partakes of the nature of a family settlement, which is always favored in the law.

The son made no representation to the widow as to the character or effect of the writing. He had no information which she did not possess. The writing has at all times been in her possession. The family settlement was fully carried out, and was unquestioned for six years after it was made.

We are cited to cases which discuss the effect of the difference between ignorance of general law and ig-

norance of the law as applied to a private right, it being contended that, while every one is charged with knowledge of general law, this rule does not apply in its application to private rights. It is insisted, therefore, that the widow's ignorance as to the legal effect of this instrument justifies and authorizes her to rescind the agreement induced by her misapprehension of the law as to the character of the instrument and its effects upon her private rights.

We do not find it necessary to review these cases or discuss the distinction between ignorance of general law and ignorance of private rights. A discussion of this subject will be found in 2 Pomeroy's Equity Jurisprudence, § 849.

A complete answer to this argument is that the widow was not ignorant of her private rights, as there was no will which determined them.

Our case of *Dudgeon* v. *Dudgeon,* 119 Ark. 128, 177 S. W. 402, is in point, and is decisive of this case. That was a suit to restore a destroyed will. The relief prayed was denied upon the ground that the proof did not sufficiently establish the provisions of the will. But the relief was also denied upon another ground. It was there said that the proof showed that the parties had entered into an agreement after the death of the testator in the nature of a family settlement, and that it is the fixed policy of courts to uphold such settlements where the proof shows them to have been made. It was there further said: "There are cases which hold that an agreement between heirs and legatees that a will should not be probated, and that the property should be distributed as an intestate estate is not contrary to public policy and that such agreement annuls the will. *Phillips* v. *Phillips,* 8 Watts, Pa. 195; *Stringfellow* v. *Early,* 15 Tex. Civ. App. 597, 40 S. W. 871. This view of the law, however, is criticized in Page on Wills at § 346, in which the author says that the propriety of this view of the law is very doubtful, and that the better practice would be for the will to be probated and for the beneficiaries then to contract between themselves with

reference to the property given them by the will, as they would with reference to property acquired in any other manner. But we are not called upon to choose between these conflicting views as to the rule that should be adopted as a matter of public policy for the reasons, to summarize, first, that the proof in this case shows only that there was a will, without showing, with the necessary certainty, what its provisions were, and, second, because the agreement reached was in the nature of a family settlement.''

In this case, as in the Dudgeon case, the relief prayed must be denied on both grounds, (1) that no will was established, and (2) the family settlement must be enforced.

The decree must, therefore, be affirmed, and it is so ordered.