**SCOTT v. BEAMS et al., and four other cases.**

Nos. 2174–2178.

Circuit Court of Appeals, Tenth Circuit

Sept. 2, 1941.

Rehearing Denied Oct. 10, 1941.

Frederick P. Cranston and Norman H. Smedegaard, both of Denver, Colo. (C. L. McGuire, of Oklahoma City, Okl., Guy D. Duncan, of Denver, Colo., and J. Q. A. Harrod, of Oklahoma City, Okl., on the brief), for appellant Bennie Barnett Scott.

J. W. Stone, of Harriman, Tenn. (D. S. Beeler, of Rutledge, Tenn., on the brief), for appellant Rosa Allen et al.

Charles E. McPherren, of Oklahoma City, Okl. (Grant Foreman, of Muskogee, Okl., L. J. Burt and E. C. McMichael, both of Sapulpa, Okl., and Neal E. Maurer, of Oklahoma City, Okl., on the brief), for appellant Dora Brady et al.

James D. Simms, of Tulsa, Okl. (James B. Simms, of Tulsa, Okl., on the brief), for appellant Joe E. Tiger and others.

Paul Pinson, of Tulsa, Okl. (I. J. Underwood, Sam S. Canterbury, and O. L. Lupardus, all of Tulsa, Okl., on the brief), for appellant Lucy Curns and another.

Kavanaugh Bush, of Tulsa, Okl. (Chas. L. Yancey and G. C. Spillers, both of Tulsa, Okl., on the brief), for appellant Louisa Murrell and others.

Eck E. Brook, of Muskogee, Okl. (Charles S. Carl, of Wewoka, Okl., and J. R. Huggins, of Ada, Okl., on the brief), for appellant Charles Barnett and others.

Elmer J. Lundy, of Tulsa, Okl. (John M. Goldesberry and Russell L. Nixon, both of Tulsa, Okl., on the brief), for appellant Martha Jane Walker.

A. E. Pearson of Oklahoma City, Okl. (L. A. Horton, of Oklahoma City, Okl., on the brief), for appellant Bertha Barnett and others.

Mae R. Stricklin, of Wartburg, Tenn. and Hughett & Hughett, of Louisville, Ky., for appellant George W. Barnett et al.

W. T. Anglin, of Holdenville, Okl., Joseph C. Stone, of Muskogee, Okl., D. A. Richardson, of Oklahoma City, Okl., and Howell Parks, of Muskogee, Okl. (Alfred Stevenson, of Holdenville, Okl., Dick Jones, of Oklahoma City, Okl., Leon C. Phillips, of Okemah, Okl., E. W. Smith, of Henryetta, Okl., Charles A. Moon, of Muskogee, Okl., Francis Stewart, of Oklahoma City, Okl., L. O. Lytle and George Jennings, both of Sapulpa, Okl., Herbert G. House and Roscoe S. Cate, both of Muskogee, Okl., Harry B. Parris, of Eufaula, Okl., and Wilbur J. Holleman and J. Garfield Buell, both of Tulsa, Okl., on the brief), for appellees.

Charles N. Champion, Asst. U. S. Atty., of Muskogee, Okl. (Norman M. Littell, Asst. Atty. Gen., and Cleon A. Summers, U. S. Atty., of Muskogee, Okl., on the brief), for the United States.

Before PHILLIPS, BRATTON and HUXMAN, Circuit Judges.

BRATTON, Circuit Judge.

Jackson Barnett, a Creek Indian, was allotted one hundred and sixty acres of Creek tribal lands in Oklahoma. Oil in large quantities was developed on the allotted land and the proceeds from the sale of royalty oil were delivered into the custody of the Secretary of the Interior for the benefit of Barnett, and more than a million dollars of the trust fund was invested in United States Liberty Bonds. Barnett and Anna Laura Lowe were pretendedly married by two conventional ceremonies in 1920, one performed in Kansas and the other in Missouri, and they lived together as husband and wife until his death. Barnett affixed his thumb mark to a written instrument which recited the gift of $550,000 of the bonds belonging to the trust estate to Anna Laura Lowe Barnett and the gift of a like amount to the American Baptist Home Mission Society on certain conditions; and the bonds were distributed as directed by the instrument. The retarded mental capacity of Barnett and some of the circumstances which came within the compass of his life were reviewed in subsequent litigation in which it was determined that the pretended gifts were invalid. Barnett v. Equitable Trust Co., D.C., 21 F.2d 325; American Baptist Home Mission Soc. v. Barnett 2 Cir., 26 F.2d 350, certiorari denied, 278 U. S. 626, 49 S.Ct. 28, 73 L.Ed. 546; Barnett v. Equitable Trust Co., 34 F.2d 916; United States v. Equitable Trust Co. of

780

New York, 283 U.S. 738, 51 S.Ct. 639, 75 L.Ed. 1379; United States v. Mott, D.C., 37 F.2d 860; Mott v. United States, 283 U.S. 747, 51 S.Ct. 642, 75 L.Ed. 1385; McGugin v. United States, 10 Cir., 109 F.2d 94. It was also adjudicated that, due to mental incapacity of Barnett to enter into a valid contract of marriage, Anna Laura Lowe Barnett did not acquire any right, title or interest in his property as the result of their pretended marriage. Barnett v. United States, 9 Cir., 82 F.2d 765, certiorari denied 299 U.S. 546, 57 S.Ct. 9, 81 L.Ed. 402.

Barnett, hereinafter called the decedent, was born sometime in about the 1840's or 1850's, the exact date being unknown, and he died in 1934, seized of real and personal property in Oklahoma, real property in California, and funds and securities in the hands of the Secretary of the Interior, all being restricted property. A proceeding for the appointment of an administrator of his estate was filed in the County Court of Muskogee County, Oklahoma; and two separate suits were filed involving questions relating to heirship of the decedent and ownership of the estate, one in the District Court of Muskogee County and the other in the District Court of McIntosh County. The United States caused the three proceedings to be removed to the United States Court for Eastern Oklahoma under the provisions of section 3 of the Act of April 12, 1926, 44 Stat. 239; that part of the first which related to the appointment of an administrator was remanded to the state court but that part which concerned the determination of heirship was retained; and the three were then consolidated for hearing and final determination. The order of consolidation provided that all applications to intervene were granted; that all parties should have the right to recast and re-file their pleadings in the consolidated action; that the action should proceed against the unknown heirs, executors, administrators, devisees, trustees, or assigns, immediate and remote, of the decedent; and that appropriate process should issue and be served by publication. More than six hundred persons including Anna Laura Lowe Barnett became parties to the action and pleaded by intervention or otherwise, each asserting that he was an heir of the decedent and entitled to all or part of the estate. Intervenor Bennie Barnett Valenta, also known as Ben-

nie Barnett Scott, contended that he was the only child of his deceased mother, Thesothle Barnett; that his mother was the sister of the decedent; and that he was therefore a nephew of the decedent. Intervenors Dora Brady and Lucinda Watashe pleaded that Albert Brady was the only child of the decedent and Cinda Colbert; that the intervenors were the daughters of Albert Brady; and that they were therefore granddaughters of the decedent. Intervenors Lucy Curns and James E. Gentry asserted that the decedent was the child of Andrew Sullivan and one Thesothle, and that the intervenors were grandchildren of Andrew Sullivan and were niece and nephew, respectively, of the decedent. Intervenors Joe H. Tiger, Annie Ponds and Peter Hamilton contended that one Petelle and one Sarfully, both deceased, were brothers of the decedent; that the intervenors Joe H. Tiger and Annie Ponds were descendants of Petelle; and that the intervenor Peter Hamilton was the son of Sarfully. Intervenors Louisa Murrell, Emmett Murrell, Flora Solomon and Cora Simms pleaded that one Dinah was a sister of the decedent; that Dinah married Wiley Sookey; that four daughters were born as the issue of such marriage; that two of such daughters died without husbands or issue; and that the intervenors were descendants of the other two. Intervenors Martha Jane Walker, Pauline Stanfield, Verna Marie Barnes, Russell Gibson, Ernest J. Gibson, Walter Fenton Gibson, and Charles J. Gibson asserted that Thesothle was the mother of the decedent; that Polly Gibson or Polly Leecher was a sister of Thesothle; and that the intervenors were descendants of Polly Gibson or Polly Leecher, deceased. Intervenors Charles Barnett, Pelo Deere, Annie Burgess, and others contended that the decedent was the son of Thesothle; that Charles Barnett, Thomas Barnett and James Barnett were half-brothers of the decedent; that Lawyer Deere was a brother of Thesothle; that intervenor Annie Burgess was a descendant of James Barnett, deceased; and that intervenor Pelo Deere and other intervenors were descendants of Lawyer Deere. Intervenors Seaborn Fisher and others, hereinafter referred to as Group I, contended that Siah Barnett was the father of the decedent; that Siah was also survived by a son, David Barnett, and three daughters, Eliza Barnett, Ellen Barnett, and

Hannah Barnett, all deceased; and that the intervenors were descendants of such brother and sisters. Intervenors Willie Conner and others, hereinafter referred to as Group II, pleaded that Thesothle was the mother of the decedent; that she was single and unmarried; that she died leaving two brothers, William Conner and Thomas Conner, and two sisters, Jennie and Hannah or Hannah Williams; and that the intervenors were descendants of such brothers and sisters, all deceased. Intervenors Chissie Stepney and Eneet Gouge and others, hereinafter referred to as Group III, asserted that the decedent had three brothers, Tecumseh, Haryaryechee, and Joe; that Tecumseh and Joe died without issue prior to the death of the decedent; and that the intervenors were descendants of Haryaryechee. Intervenors Rosa Allen, George Barnett and others pleaded that the father and mother of the decedent lived in Tennessee; that the decedent was born in that state; that he went from there to the Indian Territory; and that the intervenors were descendants from that source. Intervenors Bertha Barnett, a negress, Henry Barnett and Mayetta Kingston contended that Bertha and the decedent were married about the year 1878, and that Henry and Mayetta were the issue of such marriage. The United States pleaded that certain Indians claimed to be heirs of the decedent and had some right, title and interest in the estate; that others whose names were unknown asserted like claims; that the heirs of the decedent were restricted Indians and that his estate consisted of restricted real estate and personal property; that the United States instituted a suit against Anna Laura Lowe Barnett in the United States Court for Southern California; that a final decree was subsequently entered in such case in which it was adjudicated that the pretended marriage between the decedent and Anna Laura Lowe Barnett was void and without force and effect, and that the United States was entitled to recover for the decedent all properties which Anna Laura Lowe Barnett had acquired from him; and that such decree was res judicata of the issues which the intervenor Anna Laura Lowe Barnett tendered. The prayer was that the court determine who were the heirs of the deceased, entitled to the estate; that all claimants who were restricted Indians have the protection to which they were entitled; and that the intervenor Anna Laura Lowe Barnett be restrained and enjoined from challenging the validity of the decree entered in the cause in California. It is not necessary to set out the substance of the many other claims. Groups I, II and III of claimants entered into a so-called contract and family settlement in which it was provided, among other things, that in the event it should be finally determined that any person or persons in either group was or were entitled to inherit all or any portion of the estate, the court should be authorized to enter a decree awarding fifty per cent of the amount so inherited to the persons constituting Group I, twenty-five per cent to the persons constituting Group II, and twenty-five per cent to the persons constituting Group III.

The court found and concluded among other facts that Siah Barnett, a full-blood Creek Indian, was the father of the decedent, and that he died in the year 1897; that Thesothle, a full-blood Creek Indian, was the mother of the decedent, and that she died about the close of the Civil War; that the decedent was born in the Indian Territory; that Siah had a second wife named Mary; that Siah was survived by two sons and four daughters, the decedent, David Barnett, Eliza Barnett Fish, Ellen Barnett Grayson, Hannah Barnett Fisher, and Sissie (or Mariah) Barnett Davis who died without husband or children surviving; that Thesothle was survived by three sons, the decedent, Haryaryechee, and Tecumseh who died without issue; that the decedent and Bertha Barnett were never married; that Henry Barnett, Mayetta Kingston, and Albert Brady were not children of the decedent; that the decree entered in the United States Court for Southern California foreclosed the intervenor Anna Laura Lowe Barnett; that the persons constituting the Siah Barnett group of claimants, designated as Group I, were the nearest of kin to the decedent on the paternal side; that the persons constituting the Conner group of claimants, designated as Group II, and the persons constituting the Haryaryechee or Jim Lowe group of claimants, designated as Group III, were the nearest of kin to the decedent on the maternal side; and that the persons constituting the three groups were his sole and only sur-

viving heirs at law. These appeals were separately taken from the decree entered pursuant to such findings and conclusions. The other disappointed claimants did not appeal. The cases were submitted on a single record and were briefed and argued together.

Each appellant assails the finding against his contention of heirship with right to share in the estate, and they all attack the finding that the persons constituting the three groups were the nearest of kin and the sole and only heirs of the decedent. It is argued that such findings are not supported by substantial evidence, and that they are against the evidence and are clearly erroneous. Numerous depositions were taken and much oral testimony and documentary evidence was adduced before the court. The trial was an extended one. The trial proceedings and the depositions cover more than twelve thousand pages of typed record. And, in addition, all parties to these appeals stipulated that the members of Group I were related to each other and to Siah Barnett, as found and decreed by the court; that the members of Group II were related to each other and to "Old Man" Conner who was the father of William Conner, Hannah Williams, Jennie Jeffrey, and Thomas Conner, through whom the members of the group claim relationship to the decedent, as found and decreed; and that the members of Group III were related to each other and to their ancestor Jim Lowe (Haryaryechee) in the manner set forth in the findings and decree. Even a resume of the evidence would extend this opinion beyond reasonable bounds, and it would not serve any useful purpose. There were many sharp inconsistencies and irreconcilable conflicts in the evidence, but they were for the determination of the trial court. It may be said in summary that a painstaking review of the voluminous record convinces us that, despite the quantum of countervailing evidence, the determinative findings of the court are adequately supported by substantial evidence, implemented by the stipulation referred to, and are not clearly erroneous, due regard being given to the opportunity of the trial court to judge of the credibility of the witnesses and the weight to be given to their testimony. Findings supported in that manner cannot be disturbed on appeal. Rule of Civil Procedure 52(a), 28 U.S.C.A. following section 723c.

It is contended that the court erred in giving consideration to a certain census card. The card was a part of the records of the Dawes Commission, and it stated that Siah Barnett and Thesothle were the parents of the decedent. It is argued that the card was merely a memorandum of the Commission and was therefore hearsay. The Dawes Commission was a special tribunal created by act of Congress and vested with certain judicial powers. In the absence of fraud, gross mistake, or arbitrary action, its judgments are conclusive respecting the ultimate questions it was authorized to determine, and likewise as to every question of law or fact it was necessary to resolve in order to determine such ultimate questions. The conclusive effect of the findings of the Commission is limited to ultimate questions which it was authorized to determine, such as the persons to be enrolled. Statements and recitals in the records of the Commission bearing upon matters which were incidental and collateral to the ultimate question for determination, such as parentage, age, sex, and other like descriptive matter, are neither res judicata nor conclusive; but they are admissible in evidence and entitled to appropriate consideration along with all other evidence where the question to which they relate is in issue. Norton v. Larney, 266 U.S. 511, 45 S.Ct. 145, 69 L.Ed. 413; United States v. Mid-Continent Petroleum Corporation, 10 Cir., 67 F.2d 37, certiorari denied, Hosey v. Mid-Continent Pet. Co., 290 U.S. 702, 54 S.Ct. 346, 78 L.Ed. 603; Page v. Atkins, 86 Okl. 290, 208 P. 807; Halsell v. Beartail, 107 Okl. 103, 227 P. 392, certiorari denied, 266 U.S. 628, 45 S.Ct. 126, 69 L.Ed. 476; Mowdy v. Leeper, 122 Okl. 16, 250 P. 432; Cox v. Colbert, 135 Okl. 218, 275 P. 317; Palmer v. Replogle, 152 Okl. 140, 4 P.2d 30; Miller v. McIntosh, 157 Okl. 213, 11 P.2d 923. These cases make it clear that the card was admissible and that the descriptive matter which it contained with respect to the parentage of the decedent was entitled to appropriate consideration along with all of the other relevant evidence in the case.

It is argued that a determination of the heirs of Siah Barnett was made in connection with Loyal Creek Claim No. 663; that it is conclusive in this proceeding; and that since the decedent was not included in the list of heirs as there determined, the appellees cannot be heard

to contend that he was in fact a son of Siah. It was provided in Article IV of the Creek Treaty of June 14, 1866, 14 Stat. 785, that the United States should ascertain the amount due the respective soldiers who enlisted in the Federal army, loyal refugee Indians, and freedmen, in proportion to their several losses, and should pay the amount awarded each; that for such purpose a census of the Creeks should be taken by the agent of the United States for the Creek Nation and a roll prepared of the names of all such soldiers, loyal refugee Indians, and freedmen; and that the superintendent of Indian affairs for the Creek Nation should proceed to investigate and determine from such roll the amounts due the respective refugee Indians; and that when such awards were approved by the Commissioner of Indian Affairs and the Secretary of the Interior they should be paid in the manner specified. Siah Barnett filed Claim No. 663 in 1869, for an award of $1,111 for loss of personal property. W. B. Hazen and F. A. Field were selected as commissioners on behalf of the United States to ascertain the losses of such Creek Indians and freedmen and to make a list thereof. And the Act of March 3, 1903, 32 Stat. 982, 994, provided that the Secretary of the Treasury, under the direction of the Secretary of the Interior, should pay such Creek Indians and freedmen for their losses; that payment should be made only to those whose names appeared on the list of awards made in their behalf by Commissioners Hazen and Field; that payment should be made in proportion to the awards as set out in such lists; and that $600,000 was appropriated for that purpose. Mary Barnett, surviving widow of Siah, deceased, made an affidavit in October, 1903, in which she undertook to name the heirs of the deceased claimant and to state the relationship which each bore to him. She named herself and others, but not the decedent. However, complete accuracy cannot be accorded the affidavit as Eliza Barnett Fish was not mentioned and there can be no doubt whatever that she was the daughter of Siah and Mary. That aside, the commissioners made an award of $460, and such sum was paid to Mary and others. The decedent did not receive any part of it. But the award merely described the property loss and fixed the amount to be awarded. No reference whatever was made to the question of

the heirs of the claimant, then deceased. And the record does not otherwise contain any finding or determination of the commissioners or any other tribunal, agency, or officer of the government touching the question of heirship. Perhaps it may be surmised or inferred from the fact of payment being made to Mary and others exclusive of the decedent that they were determined to be the heirs, but there is no other basis for such a conclusion. In the absence of a showing that the question was determined by some tribunal, agency, or officer of the government clothed with authority to make the determination, this case does not call for exploration or decision as to the effect such a determination would have upon the claims of the appellees.

Next comes the contention that the agreement denominated contract and family settlement offends public policy and should therefore have been set aside. The instrument, dated June 30, 1936, recites the death of the decedent, the existence of the estate, and the pendency in this proceeding of the claims of approximately fifty different groups of claimants; recites the contention of the persons constituting each group in the contract that they were the next and nearest of kin to the decedent and therefore inherited all of his estate, the admission of the persons constituting each group that the persons constituting each of the other two groups were also related to the decedent but that the persons constituting their own particular group were the nearest in relationship and in consequence inherited the estate, and the denial of all the persons in the three groups that any of the persons in the approximately forty-seven other groups of claimants were related to the decedent in any manner or degree, or, if related, the relationship was too remote to entitle them to inherit any part of the estate; recites that the three groups were confronted with great difficulty in making proof of their exact relationship to the decedent and which of the groups were the nearest in point of relationship, because it was necessary to resort to oral testimony of witnesses concerning facts which happened forty to sixty years previously, to records which were incomplete, and to declarations made by members of the family long since deceased; recites that due to such conditions the parties were unable to forecast with any degree of certainty which of the three groups

would be adjudged the nearest of kin to the decedent and therefore entitled to prevail over the other two groups, although the claim of each group was reasonable and well supported by records, circumstances and oral proof; recites that after full and careful investigation, the persons constituting each group were convinced that the claims of the approximately forty-seven other groups of claimants were unfounded and spurious, but that contesting so many claims would involve an amount of labor and the expenditure of sums of money beyond the ability of any group alone; and recites that in view of such conditions the persons constituting the three groups believed that by not opposing each other and by uniting their efforts to contest and defeat the other claims, they would protect their own legitimate interests, promote the ends of justice, and facilitate an early conclusion of the litigation. It provides that the persons constituting each group should cooperate with those constituting each of the other two groups in the prosecution of the claim of each group, and in defending against all other claims; that the persons constituting each group should continue to prosecute their claims, and should pay the expenses incurred by them in establishing their relationship to the decedent; that in the event the court should find that any person or persons in any group was or were entitled to any part of the estate of the decedent the part awarded should be deemed to have been awarded to all persons constituting the three groups, should be apportioned on the basis of fifty per cent to the persons constituting Group I, twenty-five per cent to the persons constituting Group II, and twenty-five per cent to the persons constituting Group III, and the court should be authorized to enter a decree accordingly; that in consideration of the premises, covenants and promises therein made, each of the persons constituting each of the groups conveyed, granted, bargained, sold, assigned and transferred to each of the other persons constituting the other groups all such right, title and interest in the estate as might be necessary to vest in each group and the members thereof the proportionate parts of the estate as therein provided; that after being executed by all parties, it should be presented to the County Court of Muskogee County for approval, and if approved by such court it should then be submitted to the Secretary of the Interior for his approval; and that it should not become binding until executed and approved in the manner indicated. The contract was approved by the County Court of Muskogee County, the County Court of McIntosh County, and the Acting Secretary of the Interior. The approval of the Acting Secretary was "without prejudice to the right of any claimant and subject to the condition that all of the evidence available to the parties to the agreement shall be fully and fairly presented to the Federal Court. * * *"

Certain intervenors filed petitions in the cause in which they pleaded the execution of the contract, alleged its invalidity, and prayed that the court construe and set it aside. The matter was heard, findings of fact and conclusions of law were made, and an order was entered determining that the contract was not invalid.

■ A contract which by its inherent tendency is inimical to public welfare or inconsistent with good morals violates public policy and will not be enforced, either directly or indirectly. The validity of a contract in point of being against public policy must be measured by its inherent tendency, not the good faith of the contracting parties or the manner in which they carried it out. And the success or failure which attends the fulfillment of a contract tainted with trespass upon public policy is without moment. This comprehensive doctrine is of such long standing and wide familiarity that it cannot be necessary to review the cases without number in which a great variety of contracts have been uniformly overturned.

■ It is equally well settled that an agreement relating to a suit or proceeding in court which invites or promotes interference with full and impartial justice therein violates public policy and will not be enforced in any manner, though no actual corruption is involved. In Adams v. Outhouse, 45 N.Y. 318, two distributees of an estate charged certain irregularities in the accounts of the administrator. A secret agreement was entered into which provided that in consideration of the payment of a certain sum in cash the two distributees should withdraw their objections, agree to a settlement and accept their share of the assets in the hands of the administrator. The court held the agreement was without effect. In Lazen-

by v. Lazenby, 132 Ga. 836, 65 S.E. 120, a contract was held against public policy which provided that one having knowledge of facts tending to support the contest of a will should take no part in securing evidence but should remain neutral, and that in the event the contest failed the chief beneficiary under the will should convey to him a certain tract of land or pay him its value in cash. In Gray v. McReynolds, 65 Iowa 461, 21 N.W. 777, 54 Am.Rep. 16, the court declined to enforce an agreement to pay a legacy if the legatee would make no effort to sustain the will and in that manner defeat the rights of other legatees. In Ridenbaugh v. Young, 145 Mo. 274, 46 S.W. 959, the parties were brother and sister, and were legatees under the will of their deceased father. There was at least one other legatee. The brother and sister agreed that he should prosecute a pending suit to cancel the will, that she should acquiesce and pay the cost, and that if the will was annulled he should pay her a specified sum of money and quitclaim to the third legatee all his right, title and interest in certain real estate. The will was annulled and the suit was to recover upon the promise to pay. The court said that the contract contravened public policy and therefore denied recovery. In Cochran v. Zachery, 137 Iowa 585, 115 N.W. 486, 16 L.R.A.,N.S., 235, 126 Am.St.Rep. 307, 15 Ann.Cas. 297, recovery was denied upon a note given as part of an agreement to unite in resisting the probate of a will in order to cut off the interests of others. In Conklin v. Conklin, 165 Mich. 571, 131 N.W. 154, a legatee under a will agreed to pay certain sums of money to others in consideration of their waiving a threatened contest of the will. The agreement was stricken down. And in Gugolz v. Gehrkens, 164 Cal. 596, 130 P. 8, 43 L.R.A., N.S., 575, a nephew lived with his uncle and aunt. The uncle bequeathed one-fourth of his estate to the nephew. The aunt advised the nephew that she was dissatisfied with the will and would contest it, asked him not to object to the contest, and promised that if he would do so and she should prevail in the contest, she would make a will leaving to him a one-fourth interest in her estate. He agreed, she contested the will with success, but her will contained only a nominal cash bequest to him. The court concluded that the agreement impinged upon public policy, and therefore afforded no basis for attack upon the will of the aunt. These cases illustrate the uniformity with which courts have emphatically declined to enforce either directly or indirectly contracts (most of them apparently effected and maintained in secrecy) in which one or more parties thereto agreed for a valuable consideration either to extend or withhold affirmative action as an aid in cutting off the rights of a legatee or devisee or other person not a party to the agreement.

But a court, in determining the question whether a contract inherently tends to invite or promote interference with full and impartial justice in a pending proceeding and therefore violates public policy, should take into consideration the language used, the relation of the parties to each other and to the subject-matter, the circumstances preceding and attending its execution, and the background against which it was entered into. Conklin v. Conklin, supra; Noble v. Mead-Morrison Manufacturing Co., 237 Mass. 5, 129 N.E. 669. Here the estate of an illiterate, restricted Indian was involved. He died at a ripe age. Approximately six hundred persons claimed to be heirs and entitled to share in the distribution of the estate. Divers conflicting claims and contentions were being advanced. The identity of the parents of the decedent, the question whether he had certain brothers, whether he had certain sisters, whether certain persons bore other relationship to him, whether he married when young, whether he was the father of certain persons, and other cognate matters were among the maze of sharply contested issues. Most of the persons who had knowledge of facts or circumstances bearing upon these issues were aged, and some of them were quite illiterate. Pertinent records were meager and incomplete. Many depositions had been taken and much documentary evidence had been adduced. The persons constituting the three groups in the contract had been engaged in investigating the facts bearing upon their own claims and in combatting the claims of others. Some of the oral testimony and most of the documentary evidence which tended to support the claim of the persons constituting each group and to defeat the claims of the persons constituting the other two groups had been introduced. The persons constituting each group

claimed to be the nearest and next of kin to the decedent, but the evidence adduced and their investigation had convinced them that the persons constituting each of the other two groups were also related to him. While they had become convinced that the persons constituting each of the other two groups were related to the decedent, the persons constituting each group still contended that they were the next and nearest of kin, and were therefore entitled to the estate. And they all believed and were contending with unanimity that the persons constituting the forty-seven other groups of claimants, or thereabouts, were either not related to the decedent in any manner or degree, or, if related in anywise, the relationship was so remote that they were not entitled to any part of the estate. Stated otherwise, they united in the belief that they all were related to the decedent and in the contention that the claims of the forty-seven groups of claimants were unfounded and without merit. But it was difficult and expensive to combat and defeat the large number of such claims. The labor and expense required was too much for any one of the three groups alone. Attorneys of widely recognized ability and professional integrity, representing different groups in the contract, testified that they participated in the negotiations leading up to the preparation and execution of the agreement; that the enormous labor and expense required to make the investigation and produce the evidence necessary to overcome the proof offered by certain claimants, notably Bertha Barnett, Henry Barnett and Mayetta Kingston, were the major factors which induced the parties to enter into the agreement, and that the suppression or withholding of any evidence was never suggested, discussed, contemplated or practiced. They testified without qualification or condition that no pertinent evidence coming to their attention or knowledge had been concealed, or withheld, or excluded from the record. And the contract expressly provided, among other things, that the persons constituting each group should continue to prosecute their claims; and the approval of the Acting Secretary of the Interior, which was essential to the contract becoming binding upon the parties, was subject to the condition that all available evidence should be fully and fairly presented to the court. Moreover, the agreement was not conceived and preserved in secrecy. The Assistant United States Attorney representing the government in the proceeding attended some of the negotiations leading up to its execution. The parties contemplated from the outset and the instrument provided that it should be approved by the county court and the Secretary of the Interior before having binding effect. Counsel for certain claimants not parties to it appeared before the county court and objected to its approval. Counsel for another group endeavored to have them included in the contract, and, having failed, urged the Secretary of the Interior to withhold approval. In view of all these facts and circumstances, it cannot be said that the provision in the contract that the parties would not oppose each other but would cooperate in the presentation of their claims and would unite in combatting the claims of others necessarily meant a purpose to suppress or withhold evidence, and it is apparent that the parties did not so understand it. The provisions of the contract, the relationship of the contracting parties among themselves and to the subject-matter, the preceding and attending circumstances, and the setting which surrounded the parties at the time they entered into it, all weighed and considered together, fail to indicate or bear the earmarks of a purpose or inherent tendency to handicap or thwart the court in its search for the truth relating to the matters in issue or to interfere with full and impartial justice in the proceeding.

The contract was in the nature of a family settlement, free of purpose to withhold evidence and without other inherent tendency to interfere with full and impartial justice in this proceeding. The trial court so concluded and we share that view. For clear reasons of public policy, the law looks with favor upon the voluntary adjustment of conflicting claims by family settlement, courts encourage agreements of that kind, and ordinarily they will be upheld when entered into with a full understanding of the facts and without fraud, undue influence, or other imposition. Burnes v. Burnes, 8 Cir., 137 F. 781, certiorari denied, 199 U.S. 605, 26 S.Ct. 746, 50 L.Ed. 330; Vinson v. Cook, 76 Okl. 46, 184 P. 97; Riffe v. Walton, 105 Kan. 227, 182 P. 640, 6 A.L.R. 549; In re Schofield's Estate, 101 Colo. 443, 73 P.2d 1381; Hill

v. Breeden, 53 Wyo. 125, 79 P.2d 482; In re Smith's Estate, 103 Colo. 91, 83 P. 2d 333; Richards v. Tiernan, 150 Kan. 116, 91 P.2d 22; In re Edelman's Estate, 336 Pa. 4, 6 A.2d 511; Martin v. Martin, 98 Ark. 93, 135 S.W. 348; Davis v. Davis, 171 Ark. 168, 283 S.W. 360; Hollowoa v. Buck, 174 Ark. 497, 296 S.W. 74; Edwards v. Swilley, 196 Ark. 633, 118 S.W.2d 584; Barnett v. Barnett, 199 Ark. 754, 135 S.W.2d 828; Stark v. Stark, 201 Ark. 133, 143 S.W.2d 875; Harris v. Citizens Bank & Trust Co., 172 Va. 111, 200 S.E. 652; First National Bank & Trust Co. in Macon v. Roberts, 187 Ga. 472, 1 S.E.2d 12; Childs v. Julian, Ala. Sup., 2 So.2d 453.

■ An effort was made to disqualify the presiding judge. The first affidavit of the intervenor Dora Brady charged that during the last two days of the hearing when the affiant undertook to introduce evidence in support of her claim she became "almost convinced" that the judge was personally biased in favor of Groups I, II and III of claimants, and against the right of the affiant to be adjudged an heir of the decedent; that it appeared that the judge was personally biased in favor of the right of Groups I, II and III of claimants being held and declared the heirs of the decedent to the exclusion of the affiant; that such fact was indicated by the hostile demeanor, acts, statements and charges of the judge against the affiant's attorney, and witnesses, encouraging and seemingly approving insinuations of perjury made by the attorneys for Groups I, II and III of claimants against witnesses testifying for affiant, encouraging, approving and becoming a party to insinuations and attacks upon the ethics and integrity of her attorney, brutally and ruthlessly attacking aged and ignorant persons testifying in her behalf and threatening to have them imprisoned, permitting and approving from the bench counsel for other litigants declaring the belief that one of her witnesses was committing perjury, and on the last day of the hearing seeking to compel her attorney to withdraw from the case. The affidavit stated that certain correspondence and documents relied upon to indicate bias and prejudice had come to her attention only a day or two prior to the making and filing of the affidavit; and excerpts from the trial proceedings were attached and made a part of the affidavit. The intervenors constituting Groups I, II and III moved to strike the affidavit from the files for the reason that it was insufficient in fact and law and was presented too late. The court denied the applications, and the judge declined to be recused. Intervenors Dora Brady and Lucinda Watashe later filed a joint so-called affidavit and petition to disqualify the judge from passing the motion for new trial. It substantially repeated with some amplification the facts stated in the original affidavit of Dora Brady and made reference to certain parts of the record; and still later Dora Brady filed a separate affidavit in which she stated, among other things, that from the time counsel began the presentation of evidence in support of the claim of the affiant and Lucinda Watashe, the judge openly evidenced personal bias and prejudice against them and in favor of Groups I, II and III of the claimants, and that such bias and prejudice prevented him from according the affiant and Lucinda Watashe a fair hearing. Those affidavits were likewise denied. Affidavits of four other intervenors were also denied. One of those parties did not appeal; and the other three did not argue the question in their briefs and are therefore deemed to have abandoned it. Travelers' Insurance Co. v. Bancroft, 10 Cir., 65 F.2d 963, certiorari denied 290 U.S. 680, 54 S.Ct. 103, 78 L. Ed. 587; Colorado Central Power Co. v. City of Englewood, 10 Cir., 89 F.2d 233.

■ Section 21 of the Judicial Code, 28 U.S.C.A. § 25, provides that when a party to a civil or criminal proceeding shall make and file an affidavit that the judge before whom the proceeding is to be tried or heard has a personal bias or prejudice either against him or in favor of an opposite party, such judge shall proceed no further, but instead another judge shall be designated to act; that the affidavit shall state the facts and the reasons for the belief that such bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term of court, or good cause shall be shown for failure to do so; and that no such affidavit shall be filed unless accompanied by a certificate of counsel of record that such affidavit and application are made in good faith. The statute thus extending the privilege of dis-

qualifying a judge is remedial; but, due to its nature and the opportunity for abuse of the privilege, strict compliance with its provisions is exacted. Henry v. Speer, 5 Cir., 201 F. 869.

When an affidavit of disqualification is filed it becomes the duty of the court to determine its legal sufficiency to comply with the statute on the basis of the facts therein stated. In doing so, the court is not permitted to give any consideration to the truth or falsity of the facts charged; the facts alleged must be assumed to be as stated. And when tested in that manner, if the affidavit and accompanying certificate of counsel of record meet the requirements of the statute, the presiding judge can proceed no further; he stands recused. Berger v. United States, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481, Henry v. Speer, supra; Lewis v. United States, 8 Cir., 14 F.2d 369; Nations v. United States, 8 Cir., 14 F.2d 507, certiorari denied, 273 U.S. 735, 47 S.Ct. 243, 71 L.Ed. 866; Craven v. United States, 1 Cir., 22 F.2d 605, certiorari denied, 276 U.S. 627, 48 S.Ct. 321, 72 L.Ed. 739; Morris v. United States, 8 Cir., 26 F.2d 444.

The statute expressly requires in plain language that the affidavit shall state the facts and the reasons for the belief of bias and prejudice on the part of the judge. The excerpts from the proceedings of the trial, attached to the first affidavit and made a part of it, showed comments and criticisms but not personal bias and prejudice within the meaning of the statute. The affidavit stated indirectly and only by reference to the petition and affidavit of disqualification of Lucy Curns and others that the Assistant United States Attorney discussed the contract of family settlement with the presiding judge in the absence of the other attorneys in the case; that he stated in the course of such discussion that the contract had been referred to the Secretary of the Interior and thence to the Attorney General; that it was the belief of the Attorney General that the contract was not invalid; that it was the belief of the Assistant United States Attorney that Groups I, II and III of claimants were the heirs of the decedent; that the Assistant United States Attorney inquired whether the court would regard the contract as contemptuous; and that the court stated in reply that the contract would not be regarded in that manner and that it probably was not against public policy. The statement that the Assistant United States Attorney conferred with the judge during the absence of other attorneys in the case, of itself, was not a fact showing bias and prejudice. Neither did the statement of the court that the contract would not be regarded as contemptuous even indicate bias and prejudice. And the statement that the contract was probably not against public policy was manifestly a mere extemporaneous or offhand expression of opinion without any purpose or intent to prejudge any issue in the case and was not a fact showing bias and prejudice. Otherwise the affidavit abounded with general allegations of hostility of the court, abuse of witnesses and threats to have them incarcerated, and encouragement of attorneys for other litigants in their abuse of such witnesses; but these were conclusions, not statements of fact. For instance, one litigant might regard a statement or several statements of the presiding judge as constituting hostility, abuse of witnesses and threats of incarceration, and encouragement of counsel in their abuse of witnesses, while another litigant might regard such a statement or statements otherwise. Except the statement of the court in respect to the contract not being regarded as contemptuous and as to it probably not being against public policy, the affidavit did not set out any statement of the court, either in direct language or in substance. It requires no elucidation to make plain that the affidavit fell far short of stating facts showing bias and prejudice of the court and therefore it failed to comply with the requirement of the statute.

The privilege extended by the statute is also restricted or qualified by the requirement that the affidavit be filed not less than ten days before the beginning of the term of court at which the cause is to be tried or the matter heard, or that good cause be shown for failure to file it within that time. If in the nature of things the affidavit cannot be filed at least ten days before the beginning of the term of court it must be filed with reasonable promptitude after the disqualifying facts are known, and it must show a proper excuse for the delay. The three proceedings relating to the determination of the heirs of the decedent were initiated in the state courts in 1934, were re-

moved to the United States Court soon thereafter; and were consolidated in March, 1935. Lucinda Watashe intervened in February, 1937, and Dora Brady intervened in July, 1937. The taking of testimony before the court began in March, 1937; oral testimony and documentary evidence were introduced from time to time, the last being submitted on June 22, 1938, at which time the trial proper was concluded. The intervenors Dora Brady and Lucinda Watashe concluded the introduction of their evidence in March, 1938. The first affidavit of disqualification made by Dora Brady was filed on June 18, 1938, when the extraordinarily long and tedious trial was drawing to an end. It stated that the bias and prejudice of the judge became apparent during the last two days of the introduction of testimony tending to support the claims of the intervenors. That testimony was introduced in March. But the initial affidavit of disqualification was not filed until approximately sixty days thereafter, that is to say about two months after the bias and prejudice of the court became apparent. That was too late. Cf. Ex parte American Steel Barrel Company, 230 U.S. 35, 33 S.Ct. 1007, 57 L.Ed. 1379; Shea v. United States, 6 Cir., 251 F. 433, certiorari denied, 248 U.S. 581, 39 S.Ct. 132, 63 L.Ed. 431; Lipscomb v. United States, 8 Cir., 33 F.2d 33; Duncan v. United States, 9 Cir., 48 F.2d 128; Bowles v. United States, 4 Cir., 50 F.2d 848, certiorari denied 284 U.S. 648, 52 S.Ct. 29, 76 L.Ed. 550; Bommarito v. United States, 8 Cir., 61 F.2d 355; Davis v. Securities and Exchange Commission, 7 Cir., 109 F.2d 6, certiorari denied 309 U.S. 687, 60 S.Ct. 889, 84 L.Ed. 1030.

One remaining argument merits attention. It is urged with emphasis that the trial, including the making of findings of fact, failed to reflect that calm and deliberate consideration of the evidence and that judicial impartiality which are consonant with the principles of justice and of due process of law. Many circumstances surrounding and relating to the execution and approval of the contract of family settlement, a conference which the Assistant United States Attorney representing the Government had with the court in chambers in the absence of the other attorneys, a letter written by the Assistant United States Attorney and signed by the United States Attorney to the Attorney General respecting the contract and expressing the opinion that the persons constituting Groups I, II and III were the heirs of the decedent and entitled to prevail, the cooperation which the Assistant United States Attorney extended to such groups of claimants, other acts and incidents, and many statements, comments and criticisms of the court, as well as references to the calling of a grand jury and punishment for perjury, are brought together and relied upon to sustain the broad contention. The only phase of the matter worthy of discussion is the conduct of the court. The record indicates that the attitude of certain attorneys was provocative at times, and the court was justified in the belief that some of the testimony was fabricated. Still, we are not to be understood as approving all of the statements, comments and criticisms coming from the court, or the excess of interference with the attorneys in their examination of the witnesses. But there is no showing whatever that the complaining parties failed to introduce all of the evidence which was available to them. And we think the court reached the right conclusion in the end. Another long and expensive trial, without the incidents of which complaint is made, would in all probability conclude with like findings of fact and judgment. The ends of justice would therefore not be furthered with reasonable dispatch by ordering a retrial.

The judgment is affirmed.